BURBANK LIQUIDATING CORPORATION (FORMERLY BURBANK SAVINGS & LOAN ASSOCIATION), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

UNITED ASSOCIATES, INC. (FORMERLY UNITED SAVINGS & LOAN ASSOCIATION), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79044, 79184. Filed March 25, 1963.

*Ernest R. Mortenson, Esq.,* for the petitioners.
*Marion Malone, Esq.,* for the respondent.

1002

1004

OPINION.

FAY, *Judge:* The respondent contends that the petitioners were required to include the balance of their reserve for bad debt accounts, insofar as they represent amounts deducted after December 31, 1951, in income for the year in which they transferred the debts to which the reserves were applicable. The petitioners, however, contend that they were entitled to maintain these reserve accounts throughout the year in issue.

In *Arcadia Savings & Loan Association,* 34 T.C. 679 (1960), affd. 300 F. 2d 247 (C.A. 9, 1962), this Court held that a savings and loan association was required to include in income in the year in which a reserve for bad debts became unnecessary the amount deducted as an offset to taxable income as an addition to the reserve. That case is similar to the instant case in that (1) a savings and loan business was sold by the taxpayer and (2) any loan that was transferred was to be repurchased if within 18 months of the transfer a default occurred. In the *Arcadia* case the Commissioner included a portion of the amount of the questioned reserve in income in the first year following the year of sale and the balance of it in the second year. The correctness of this allocation by the Commissioner was stipulated to by the parties and was not in issue in that case. The sole issue in that case was whether a reserve for bad debts created by additions which offset taxable income must be restored to income in the year in which the need for the reserve ceased. This was decided in the affirmative.

In the instant case the petitioners have raised the issue of the proper year for the inclusion of the reserves in income. The petitioners contend that they are entitled to maintain the reserves which they set up prior to the sale to Home for the 18-month period during which they were responsible for the loans they transferred. Both petitioners in transferring their loans receivable effective March 1, 1954, agreed to repurchase any loan on which there was a default during the 18 months following the transfer. Thus, the petitioners argue that they remained in a position to suffer a loss with respect to these loans.

The bad debt reserves of the petitioners were built up by large special deductions allowed to savings and loan companies by section 23(k) of the Internal Revenue Code of 1939. Implicit in the position

of the petitioners is the contention that they are entitled to maintain the unusually large reserve accounts built up by special deductions while they were in the savings and loan business in spite of the fact that they ceased to engage in that business. When the petitioners ceased to be savings and loan institutions they ceased to have the need of that type of institution for a large reserve for bad debts. As was stated by the Court of Appeals for the Ninth Circuit in *Arcadia Savings & Loan Association* v. *Commissioner, supra* at 251:

To us, the significant facts are that Arcadia received a tax benefit when its 1952 net income escaped taxation upon being added to its reserves for bad debts and and that *the need for such reserves ceased following the sale of its business and real estate loans.* [Emphasis added.]

Indeed, the need for such large reserves would be difficult, if not impossible, to demonstrate in view of the fact that many of the loans transferred by the petitioners were Government insured. Consequently, it is not at all clear under which circumstances, if any, the petitioners would be entitled to carry these large reserves on their books. We need not, however, decide this question as we may dispose of this issue on other grounds.

After the transfer to Home, any loss to the petitioners with respect to loans that had been made by them would not relate to a debt owing to the petitioners but would relate to a debt owing to their transferee, Home. The possibility of loss to the petitioners arose only from their contingent liability to repurchase any loan that might be defaulted within the 18 months following the transfer of the loans to Home. This Court has held that a taxpayer is not entitled to maintain a reserve for bad debts as a provision for contingent liabilities. *Hoover Grain Co.*, 14 B.T.A. 781 (1928); *Farmville Oil & Fertilizer Co.*, 30 B.T.A. 1048 (1934), affd. 78 F. 2d 83 (C.A. 4, 1935); *William M. Davey*, 30 B.T.A. 837 (1934). Thus, we must hold that the petitioners were, after the transfer of their loans, no longer entitled to maintain reserves for bad debts. It follows, then, that the amounts accumulated in these reserves after December 31, 1951, must be taken into income in the year in which the petitioners transferred their accounts, in accordance with our decision in *Arcadia Savings & Loan Association, supra.*

In connection with the contentions of the petitioners, we have considered the case of *Wilkins Pontiac* v. *Commissioner*, 298 F. 2d 893 (C.A. 9, 1961), reversing 34 T.C. 1065 (1960). See also *Foster Frosty Foods, Inc.*, 39 T.C. 772 (1963). We believe *Wilkins Pontiac* is distinguishable from the present situation. In *Wilkins Pontiac* the taxpayer, an automobile dealer, took notes in payment for goods sold and discounted them regularly with recourse to a finance company. The taxpayer there sought a deduction for an addition to a

reserve for bad debts based on the notes taken and discounted. In the present case the facts are very different. The petitioners, former savings and loan companies, sold all of their loans with an agreement to purchase those defaulted within 18 months and ceased to engage in the savings and loan business. These factual differences include a number of significant distinctions. Among these the following two seem especially significant. In *Wilkins Pontiac* the taxpayer transferred the notes he received with full recourse. In the instant case the petitioner's responsibility for the loans they transferred (presumably long-term mortgage notes) was to continue only for a period of 18 months and applied only to notes that were defaulted during that period. In *Wilkins Pontiac* the taxpayer was apparently continuing in business and receiving and discounting notes on a regular basis. In the present case, however, the petitioners ceased to conduct the savings and loan businesses and therefore ceased to have any need for the unusually large reserve accounts allowed to savings and loan companies.

United also contends that after the transfer of its loans to Home, it retained sufficient loans to justify the retention of the reserve for bad debts. In support of this contention, counsel for the petitioners has pointed to the fact that the comparative balance sheet submitted with United's return for the year in issue showed after the asset title "Notes and accounts receivable" (net of bad debt reserves) a figure of $36,959,762.54 for the end of the prior taxable period and a figure of $1,806,200 for the end of the taxable year in issue. However, this balance sheet does not reflect substantial land holdings which the stipulation shows United owned at the beginning of the taxable year in issue. Moreover, the amount shown under "Notes and accounts receivable" for the end of the taxable period is the exact book figure revealed for land held at the beginning of the period. Thus, it appears that the figure under "Notes and accounts receivable" at the beginning of the period may have included the land, and the figure shown for the end of the period may represent land holding or debt acquired from the sale of land during the year in issue. However this may be, United has failed to show by a preponderance of the evidence that it retained any loans for which it would be entitled to maintain a bad debt reserve.

On behalf of United, it is also contended that the figure shown in the deficiency notice as the amount contained in the accounts representing the reserve for bad debts is substantially larger than it should be. In support of this contention, United presented the testimony of an accountant who stated that he examined the available books of United and that his examination revealed that the total of the amounts in accounts constituting the reserve for bad debts was substantially

less than the figure for this total used in the deficiency notice. However, this witness testified that he had made his examination shortly before the trial, that he had not made a complete audit, that he did not believe he had all of United's books available, and that he was unable to reconcile the figures found in the bad debt reserve accounts with the figures relating to them which appeared on prior tax returns submitted by United. On the other hand, the figures used in the deficiency notice appear to have been taken from tax returns submitted by United which are in evidence in this case. These figures are consistent with the returns. With the evidence in this posture, we must hold that United has failed to establish by a preponderance of the evidence that respondent was in error in the figures used in the deficiency notice.

The accountant who testified for United did point to certain losses (a discount of $250,000 on the sale of loans, a loss of $150,000 more or less on loans to Grayson Investment Corp., and others) as possible sources for the reduction of the amounts that should be shown in the bad debt accounts. However, the deductibility of these items will be discussed separately and therefore need not be treated as an aspect of this question.

United contends that it is entitled to an ordinary loss deduction as a result of the discount of $250,000 provided for in article I of the agreement covering sale of its loans to Home. The fact that this loss occurred is evidenced by article I of the agreement under which United transferred most of its assets and liabilities to Home and is not disputed by the respondent. However, the respondent contends that this loss is capital rather than ordinary.

Section 1221(4) of the Internal Revenue Code of 1954 excludes from capital assets:

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); * * *[1]

The respondent contends that United's mortgage loans are not included within this language. There appear to be no decided cases on the issue in question.[2] However, we believe that the mortgage loans made in the ordinary course of its business are "notes receivable acquired * * * for services rendered" and, thus, are ordinary rather than capital assets. Certainly, the business of a savings and loan

---

[2] The case of *Investors Diversified Services, Inc.*, 39 T.C. 294 (1962), involved the question whether loss on the sale of mortgage notes by a corporation that was engaged in developing and originating first mortgage loans on real property was capital or ordinary. We held that it was capital. There, however, the petitioners only contended that the notes involved were held for sale to customers; they made no contention that the notes were taken in the ordinary course of their business for services rendered. Thus, the present question was not involved in that case, and it is not controlling here.

company could properly be described as "rendering the service" of making loans. Therefore, we hold that United's loss on the sale of its loans is deductible as an ordinary loss.

United also contends that it is entitled to a deduction for a loss incurred resulting from loans to the Grayson Investment Corp., Michael Grayson and Co., and Southern California Builders, which were referred to in article VI of United's agreement with Home. There is ample evidence that both parties to the agreement expected a loss to result from this transaction. However, the only evidence that such a loss occurred and of its amount is the difference between the balances found in the accounts serving as a reserve for bad debts as found by United's witness and the amounts originally transferred to those accounts as shown by United's tax return. This difference is a figure of approximately $429,000. If the loss of $250,000 on the sale of United's loans is deducted there is left an amount of approximately $179,000. The accountant who testified on behalf of United stated that he thought this sum might refer to the "loss of $150,000, more or less" mentioned in article VI of the agreement with Home as expected to result from the loans in question. United there agreed to bear whatever loss resulted. However, the pro forma balance sheet as of February 28, 1954, which was submitted in evidence, shows that United included in its reserve accounts an amount of $179,886.01 as a reserve for the payment of accrued dividends on share accounts. Thus, the difference in question might refer at least as easily to the reserve for accrued dividends as to a loss on these loans. Therefore, United has failed to establish by a preponderance of the evidence that it is entitled to any loss deduction with respect to the loans in question.

United contends that it is entitled to capital gains treatment on the gain from the sale of the lots retained by it after the transfer to Home.

The facts as found by us convince us that this property was originally acquired by United for sale to customers in the ordinary course of its business. There is nothing in evidence to show us that this intent was altered prior to the sale of the property. Therefore, we hold that the sale of the property resulted in ordinary income rather than capital gain. *Cohn* v. *Commissioner*, 226 F. 2d 22 (C.A. 9, 1955), affirming 21 T.C. 90 (1953).

The respondent seeks to impose upon United the addition to tax for negligence provided in section 6653(a) of the Internal Revenue Code of 1954. This section provides:

SEC. 6653.　FAILURE TO PAY TAX.

　(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment [3] * * *

---

　[3] The term "underpayment" when used with regard to income taxes is defined in sec. 6653(c)(1) as a deficiency as defined in sec. 6211, with the exception that the tax shown on a return should be taken into account only if the return has been timely filed or filed within the period of any extension that has been granted.

is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

The respondent's first contention in this regard is that the failure of United to disclose on its tax return that it eliminated a part of its bad debt reserve accounts in recording the redemption of stock renders it liable for the addition to tax. Mere nondisclosure in itself is not a ground for the imposition of the addition to tax. A number of cases have held that disclosure of facts has made the addition to tax inapplicable in a case in which it might otherwise have been imposed. No case, however, has imposed the addition to tax for nondisclosure of an item of income where the taxpayer was not negligent in failing to include the item in income and did not intentionally disregard rules and regulations in failing to do so. The respondent urges, however, that United in failing to show this transaction in proper accounting form on its return showed "intentional disregard of rules and regulations." However this may be, no deficiency was due to the failure to provide information on the return as required by regulations. The deficiency resulted from failure to include in income the accounts constituting the reserve for bad debts questioned by the Commissioner. Section 6653 of the 1954 Code requires that a deficiency be due to the negligence or other stated conduct before the addition to tax may be imposed. Thus, the question becomes: Was United negligent in failing to include in income the appropriate portion of its reserve for bad debts? Savings and loan associations were tax exempt until January 1, 1952, and the language, which is now included in section 593 of the Internal Revenue Code of 1954, allowing them to maintain large reserves for bad debts was new at that time. Savings and loan companies were contesting the legal status of these reserves in litigation that was not concluded until 1962 in *Arcadia Savings & Loan Association* v. *Commissioner*, *supra*. In view of these facts we believe that United had reasonable grounds to differ with the Commissioner and, therefore, the addition to tax should not be imposed. *Herman Senner*, 22 B.T.A. 655 (1931).

The respondent also contends that the inaccuracies in the schedule supporting United's report of the sale of its assets on its return and the improper balance sheet entries resulting from the erroneous recording of a note payable constitute negligence. Neither of these items resulted in any deficiency. They, therefore, may not be made the basis of an addition to tax for negligence.

> *Decision will be entered for the respondent in Docket 79044.*
>
> *Decision will be entered under Rule 50 in Docket 79184.*