REDWOOD EMPIRE SAVINGS & LOAN ASSOCIATION, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 78–1775.

United States Court of Appeals, Ninth Circuit.

Aug. 11, 1980.

Rehearing Denied Oct. 7, 1980.

Paul E. Anderson, San Francisco, Cal., for petitioner-appellant.

Daniel F. Ross, Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee; M. Carr Furgson, Tax Div., Dept. of Justice, Washington, D. C., on brief.

Before WALLACE and FARRIS, Circuit Judges, and KARLTON,* District Judge.

* Honorable Lawrence K. Karlton, United States District Judge, Eastern District of California, sitting by designation.

WALLACE, Circuit Judge:

Taxpayer Redwood Empire Savings & Loan Association (Redwood) appeals from several adverse rulings of the United States Tax Court. Redwood contends that the Tax Court erred in upholding the conclusion of the Commissioner of Internal Revenue (Commissioner) that Redwood could not deduct from its taxes certain losses and payments as ordinary business expenses under the Internal Revenue Code. We affirm.

This case arises from Redwood's purchase and sale of property known as the Malibu Springs Ranch (Malibu Springs). Redwood purchased Malibu Springs in 1967 for $750,-000 and sold it in 1972 for $277,539. From 1970 to 1972, Redwood also paid legal fees to defend a lawsuit involving Malibu Springs, as well as $300,000 in 1972 to settle the suit. Redwood treated its loss on the sale of Malibu Springs and its expenses in defending and settling the lawsuit as deductible ordinary business expenses. The Commissioner disallowed these deductions. The Tax Court affirmed the Commissioner's action. 68 T.C. 960 (1977).

I

The first issue is whether the Tax Court correctly determined that Malibu Springs was a capital asset, thus precluding Redwood from declaring an ordinary loss on its sale. Redwood contends that the property was not a capital asset because it was held "primarily for sale to customers in the ordinary course of [its] trade or business," I.R.C. § 1221(1). In the alternative, Redwood argues that the purchase and sale of Malibu Springs was an integral part of its business of making loans, entitling it to ordinary loss treatment under the doctrine of *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

A.   *Section 1221(1)*

We have looked to a number of factors in determining whether properties are "held . . . primarily for sale to customers in the ordinary course of . . . business," I.R.C. § 1221, including "the nature of the acquisition of the property, the frequency and continuity of sales over an extended period, the nature and the extent of the taxpayer's business, the activity of the seller about the property, and the extent and substantiality of the transactions." *Austin v. Commissioner*, 263 F.2d 460, 462 (9th Cir. 1959). *See Parkside, Inc. v. Commissioner*, 571 F.2d 1092, 1096 (9th Cir. 1977); *Los Angeles Extension Co. v. United States*, 315 F.2d 1, 2–3 (9th Cir. 1963). But we have also warned that "each case must be decided upon its particular facts, and the presence of any one or more of these factors may or may not be determinative of a particular case." *Austin v. Commissioner, supra*, 263 F.2d at 462.

This warning is particularly apt in the somewhat unique setting of real estate held by a savings and loan association. Section 6705 of the California Financial Code authorizes savings and loan associations to invest in real property for specific kinds of residential development.[1] The typical purpose of such investment is to further a chief business purpose of savings and loan institutions—generation of loans.[2] Thus, in *Burbank Liquidating Corp. v. Commissioner*, 39 T.C. 999, 1010 (1963), *aff'd in part and rev'd in part on other grounds*, 335 F.2d 125 (9th Cir. 1964), the Tax Court held that a savings and loan association's section 6705 property, acquired for sale to customers in order to generate loans, was held for sale to customers in the ordinary course of business. *Id.* at 1003–05, 1010. In that case,

---

1. Section 6705 reads in part:

   An association may invest in real property and such investment may include subdividing and developing real property and building homes and other buildings on such property principally for residential use by veterans, housing for the elderly, or urban renewal or improvement. An association may own, rent, lease, manage, operate for income, or sell such property.

2. The several ways in which the acquisition and sale of section 6705 property help savings and loan associations to generate loans are detailed in the Tax Court's opinion. *See* 68 T.C. at 964–65.

the Tax Court found it unnecessary to discuss at length such potentially and normally relevant factors as the activity of the seller about the property or the frequency and continuity of the taxpayer's real estate transactions generally.

Because Redwood recorded its purchase of Malibu Springs under section 6705, it contends, relying on *Burbank Liquidating*, that the property was necessarily held primarily for sale to customers in the ordinary course of its business of making loans. We agree with the Tax Court's statement in the case before us, however, that "the mere fact that an association justifies acquisition of real property under section 6705, and labels it section 6705 property, does not automatically qualify it as property held primarily for sale to customers in the ordinary course of its business. For tax purposes at least that would depend on the actual purpose for which the property was acquired, held, and sold." 68 T.C. at 970. Moreover, even if legitimate section 6705 property were inherently business property, as Redwood contends, the Tax Court specifically found that Redwood neither acquired nor developed Malibu Springs for any of the purposes authorized by the statute. *Id.* at 975.

The objective evidence of the circumstances surrounding the acquisition of Malibu Springs supports the Tax Court's finding that Redwood did not acquire the property to generate loans. While the ultimate question concerns Redwood's purpose in holding the property at the time of sale, *Parkside, Inc. v. Commissioner, supra,* 571 F.2d at 1097 (Kennedy, J., dissenting); *Biedenharn Realty Co. v. United States,* 526 F.2d 409, 420–22 (5th Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), the original purpose for acquiring the property is clearly a relevant factor in determining the purpose for which it is held.

The Tax Court found that Redwood acquired Malibu Springs as part of a scheme to defraud prior owners of the property.

Its 1967 acquisition of the property was the final step in a complicated series of transactions engineered by the chairman of Redwood's board of directors, Henry Kersting. In 1964, Kersting arranged for the Gamms, his parents-in-law, to purchase Malibu Springs from the Rodas for $600,000. The Gamms paid $60,000 in escrow, and Kersting, his wife, and the Gamms executed a promissory note for the balance. The Rodas did not retain a security interest in the property. Instead, as sole security for the note, Kersting pledged the stock he owned in Mendocino Financial Corporation, even though this stock had previously been pledged as security for a loan of $1,500,000. The note to the Rodas was never paid.

The Gamms were residents of Germany and were apparently involved only as a front for Kersting. During the years from 1964 to 1967, Malibu Springs went from the Gamms to Redwood twice, so that Redwood's 1967 purchase of Malibu Springs was actually a reacquisition of the property. The Tax Court concluded that, after Redwood's 1967 purchase,

> the Gamms (or Kersting) had $750,000 of [Redwood's] cash, the Rodas had received only $60,000 of their sales price from the Gamms (or Kersting), and [Redwood] owned [Malibu Springs] for which it had paid a price apparently far in excess of its value. Looking at the above transactions objectively suggests that the principal purpose for the acquisition of the property by [Redwood] was to permit Kersting to bilk the Rodas out of their property for $60,000 and to permit Kersting to withdraw $750,000 in cash from [Redwood] in exchange for the property for which he had actually paid only $60,000.

68 T.C. at 973.

Although Redwood seeks to characterize this finding as conjectural, it has not demonstrated that it was clearly erroneous.[3] Redwood suggests further that even if the property were acquired to perpetuate a fraud, it does not follow that it was ac-

---

**3.** Our review of Tax Court findings "with respect to the nature of a taxpayer's holdings under section 1221(1) is subject to the restraint of the 'clearly erroneous' rule." *Parkside, Inc. v. Commissioner,* 571 F.2d 1092, 1094 (9th Cir. 1977).

quired as a capital investment rather than for sale to customers. But Redwood's argument ignores that transactions receive capital treatment unless the property sold or purchased falls within one of the five exceptions to section 1221's broad statutory definition of a capital asset. Property acquired and held for purposes not provided for in the limited exceptions to section 1221 is considered capital.

Moreover, other objective evidence supports the Tax Court's finding that the property was not acquired primarily for sale to customers. The property was 500 miles from Redwood's principal office. To make loans on the sale of such far-off lots would have required approval of the Federal Home Loan Bank Board (FHLBB). *See* 68 T.C. at 966. The Tax Court believed it unlikely that many purchasers would have carried loans with such a distant lending agency. Finally, as we observed earlier, the Tax Court found that there was no evidence that Redwood ever considered developing the lots for the purposes specified in section 6705; and any other development would have been outside the scope of Redwood's authorized business.

Redwood objects to the Tax Court's reliance on the distance between Malibu Springs and its principal office. Redwood first contends that FHLBB permission to grant loans is largely a formal matter. It bases this assertion on the fact that it did obtain permission to finance this very sale of Malibu Springs. But the record shows that Redwood sought permission to finance the buyer's purchase of the property as a step in salvaging its business, not as an ordinary part of its operations. FHLBB merely replied that advance approval was unnecessary in a bona fide salvage operation.

Redwood next contends that the actual financing of the sale of Malibu Springs negates the Tax Court's inference that Redwood would not have acquired property to develop for loan purposes so far from its home. However, Redwood's eventual financing of the sale of the property to a single buyer hardly proves that Redwood

purchased such distant property to further a loan-generation objective; the greater likelihood is that Redwood financed the purchase in order to make the transaction attractive to the buyer. We conclude that the location of the property, and the obvious practical and legal obstacles to its development for the purpose of generating loans, when combined with the evidence that it was acquired as part of a fraudulent scheme, amply demonstrate that the finding that Malibu Springs was not acquired for sale to customers in the ordinary course of its business was not clearly erroneous.

The record also supports the Tax Court's finding that Redwood's purpose in holding Malibu Springs did not change from the time of acquisition until the time of sale. Shortly after Redwood reacquired the property in 1967, it gained a new chief executive officer. It is uncontested that, after this time, Redwood made extensive efforts to sell the property. The property was listed, sales brochures were prepared, potential buyers were contacted, advertising was employed, and a feasibility study was made to determine the best use of the property. At one point, Redwood sought to have the property zoned to meet the requirements of one potential buyer. The Tax Court concluded that while these actions might have been taken by an owner in the real estate business, they were also consistent with Redwood's announced purpose of seeking to dispose of a costly capital investment that threatened its regular business. This finding is not clearly erroneous. Although Redwood took steps to sell the property, and at one time even considered subdividing it as a means to that end, at no time did it consider developing it for the purpose of generating loans. There is no evidence that rebuts its own characterization before the FHLBB that it was engaged in a salvage operation in selling the property.

In light of the findings of the Tax Court, we need not discuss the nature and extent of Redwood's overall dealing in real estate. During the years it held Malibu Springs, Redwood owned five other parcels. We need not resolve the parties' dispute con-

cerning the significance of Redwood's having reported its first three sales of property as capital transactions, and its subsequent treatment of similar sales as ordinary income. These other dealings are inconclusive, and do not assist in determining whether the attacked findings are clearly erroneous.

### B. *The Corn Products Doctrine*

The applicability of the doctrine enunciated in *Corn Products Refining Co. v. Commissioner, supra*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, turns on whether the sale of Malibu Springs was an integral part of Redwood's business of making loans. We have already sustained the Tax Court's finding that the loan associated with the sale transaction was incidental to Redwood's salvage purpose. There is thus no factual basis for application of the *Corn Products* rationale here.

### II

■ The next issues concern the deductibility of legal fees and settlement costs incurred by Redwood in defending against the lawsuit brought by the Rodas in connection with the Malibu Springs sales transactions. Redwood first contends that these expenditures were deductible pursuant to I.R.C. § 162(a). Legal expenses and settlement costs incurred in defending against a claim of fraud that would injure or destroy a business have been held to be ordinary and necessary business expenses. *Commissioner v. Heininger*, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943) (legal expenses); *North American Investment Co. v. Commissioner*, 24 B.T.A. 419 (1931) (settlement payment). But legal expenses and settlement payments incurred to defend or protect title to property are nondeductible capital expenditures. *Boagni v. Commissioner*, 59 T.C. 708, 713 (1973) (legal expenses); *Yates Industries, Inc. v. Commissioner*, 58 T.C. 961, 971–73 (1972), *aff'd*, 480 F.2d 920 (4th Cir. 1973) (settlement payment).

■ The appropriate test for determining whether Redwood expended these funds to defend or perfect title required the Tax Court to determine the origin and essential nature of the claim, rather than Redwood's dominant purpose in defending and settling the suit. *Anchor Coupling Co. v. United States*, 427 F.2d 429, 431–33 (7th Cir. 1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971); *Boagni v. Commissioner, supra*, 59 T.C. at 713; *Arthur H. DuGrenier, Inc. v. Commissioner*, 58 T.C. 931, 937–38 (1972). The Tax Court found that the Rodas' lawsuit originated in the transactions by which Redwood acquired the property, and that this fraud claim challenged the validity of Redwood's title to the property. It therefore held that the purpose of the defense and settlement of the suit was to defend or protect title. We agree.

Redwood argues that the Rodas' action essentially sought damages for fraud, and that Redwood's defense in settlement of the action was not to defend or protect its title to the property, but to avoid liability for exemplary `damages. Redwood also observes that the Rodas refused Redwood's offer to return the property and that the Rodas held no mortgage or other claims against the property. Finally, Redwood contends that the fraud in the acquisition of the property was committed by Kersting, not Redwood, and that Redwood was potentially liable only as Kersting's alter ego.

None of Redwood's points affects the Tax Court's position that the Rodas' claim originated in both Kersting's and Redwood's acquisition of a capital asset, and would have brought into question the validity of Redwood's title. To focus on Redwood's allegedly dominant concern about potential exemplary damages would be to allow the dominant purpose of the defendant to determine the nature of the claim. This would resurrect the "dominant purpose" test in a new guise, and would undermine the rationale for adopting the more objective test focusing on the nature of the claim. *See, e. g., Anchor Coupling Co. v. United States, supra*, 427 F.2d at 433. In addition, it would ignore that the Rodas actually settled for a portion of what they clearly sought, the balance of the purchase price for Malibu Springs. In this respect,

this case is controlled by our holding in *Murphy Oil Co. v. Commissioner*, 55 F.2d 17, 25–26 (9th Cir.), *aff'd*, 287 U.S. 299, 53 S.Ct. 161, 77 L.Ed. 318 (1932).

As to Redwood's contention that only Kersting committed fraud in acquiring the property and in denying the Rodas the agreed purchase price, it seems reasonably clear that Redwood would not have settled with the Rodas, even out of concern for potential exemplary damages, unless it recognized that Redwood might be liable for Kersting's transgressions. Redwood's cash settlement cleared the title to the property so that Redwood could sell the property to someone else. The settlement price must therefore be viewed as an additional element of the purchase price for the property. We conclude that the legal expenses and settlement costs were capital outlays pursuant to section 162(a).

▪ Second, Redwood contends that the attorney's fees are deductible as a theft loss under I.R.C. § 165(a). *See Vincent v. Commissioner*, 219 F.2d 228 (9th Cir. 1955). The Tax Court's opinion does not address this issue, and our review of the record does not reveal that it was raised below. It is the general rule that " 'a federal appellate court does not consider an issue not passed upon below.' " *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978), *quoting, Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). Although there are several narrow exceptions to this rule, Redwood has offered no reasons for finding any of them applicable. *See United States v. Patrin, supra*, 575 F.2d at 712–13. Moreover, it does not appear that Redwood developed the factual basis to establish a section 165(a) deduction. *See, e. g., Zaccaria v. Commissioner*, 20 T.C.M. 478 (1961). It is thus not within our province to rule on Redwood's alternative theory for justifying its deduction of attorney's fees as an ordinary expense.

AFFIRMED.