REDWOOD EMPIRE SAVINGS AND LOAN ASSOCIATION, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Redwood Empire Sav. & Loan Asso. v. Commissioner
Docket Nos. 11948-77, 11949-77, 11950-77.
United States Tax Court
T.C. Memo 1985-332; 1985 Tax Ct. Memo LEXIS 300; 50 T.C.M. (CCH) 345; T.C.M. (RIA) 85332; July 8, 1985. *300 P, a California savings and loan association, purchased unimproved real property in 1962. At the time of purchase, P entered into a take-out loan commitment and repurchase agreement with D. D defaulted on his obligations. In 1964 P transferred the property to G for $265,000 and then reacquired the property from G for $175,725.50 in 1965. P sold the property to the State of California for $55,349 in 1974 and claimed an ordinary loss on the sale. R determined the loss to be a capital loss. Held, property sold by P was not property held for sale to customers in the ordinary course of P's business, and loss on the sale thereof was a capital loss. Paul E. Anderson, for the petitioners. Robert W. Towler, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies in petitioner's corporate income taxes for the following calendar years: Year
Deficiency
1973
$87,795
1974
51,847
1975
26,667
*302 After concessions, the issue for decision is whether certain unimproved real property was held by petitioner as a capital asset at the time of its sale or as property primarily held for sale to customers in the ordinary course of its trade or business under section 1221(1). [2]
FINDINGS OF FACT Certain facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Respondent issued statutory notices of deficiencies to Redwood Savings and Loan Association, Financial Savings and Loan Association of Northern California (successor-in-interest to Redwood Empire Savings and Loan Association) and Financial Savings and Loan Association of Northern California (formerly Redwood Empire Savings and Loan Association). Petitioners are one and the same and with be referred to as petitioner. Petitioner is a California corporation. Its principal office was located in Chico, California, at the time the petition was filed herein. During *303 the period 1961 through 1975, petitioner was a California savings and loan association as defined in the California Financial Code section 5004 (West 1968). Petitioner's accounts were insured by the Federal Savings and Loan Insurance Corporation (FSLIC) under 12 U.S.C. sec. 1726. The FSLIC is an independent corporate instrumentality and agency of the United States under the direction and control of the Federal Home Loan Bank Board. Petitioner, as a California savings and loan association, insured by FSLIC, was subject to the provisions of the California Financial Code section 5000, et seq., and regulations of the Federal Home Loan Bank Board. During the years 1962 through 1975, petitioner's principal office was located at 700 South State Street, Ukiah, California. From January 1, 1964 through February 4, 1968, petitioner had 15,000 shares of stock outstanding. Mendocino Financial Corporation owned 14,450 of those shares. Mendocino Financial Corporation had 15,000 shares of stock outstanding of which 14,300 shares were owned by Henry Kersting (Kersting). Kersting was chairman of the Board of Directors for both petitioner and Mendocino Financial Corporation *304 from January 1, 1964, through December 31, 1966, and was also president of Mendocino Financial Corporation during that period. At the time the transactions in issue occurred, the function of a savings and loan association was to encourage thrift and home ownership. Interest would be paid on the deposits that were made, and then the association would lend those funds out in the form of mortgages on residential property. Profitability of the association was determined by the differential between the interest paid by it on deposits and the interest paid to it on the loans it made. Under the California Financial Code (CFC), savings and loan associations were permitted to own the following types of real estate: (1) association permises; (2) property acquired pursuant to section 6705 CFC; and (3) property acquired under section 6707 CFC in settlement of loans either through foreclosure or deed in lieu of foreclosure. Section 6705 CFR permits a savings and loan association to acquire unimproved land for the purpose of providing housing for veterans and the elderly and for urban renewal or *305 improvement. In addition, a savings and loan association may purchase unimproved real property pursuant to section 6705 CFC in order to: (1) obtain appreciation in value; (2) develop property and obtain profits from the sale of the developed property either as one property or in parcels; or (3) to generate loans for itself. A savings and loan association may generate loans for itself in a number of ways. For instance, a savings and loan association may purchase unimproved real estate and subdivide it. The association can then either sell unimproved lots and finance the construction, or build on the property and finance the purchase of the improved property. It may also purchase subdivided property and finance the resale of the individual lots. An alternative method for generating potential loans is through "take-out" commitments which are issued by a savings and loan association to an individual financier in which the association agrees to make a loan to the borrower in the future. Take-out commitments are ordinarily utilized in transactions where lots are sold to a builder who will secure a construction loan, build and then sell with the savings and loan association furnishing *306 the new loan to the subsequent purchaser. In lieu of take-out commitments, an association may "warehouse" real property. Warehousing may be described as the situation where the association acquires property in connection with an agreement with a developer whereby the developer will acquire the property from the association at an agreed upon future date for a price provided in the agreement. The profit generated from the sale stands in the place of the interest and points normally earned on a loan. Warehousing enables a savings and loan association to circumvent certain state law restrictions on financial institutions limiting the maximum loan amount that may be made on unimproved real property to 70 percent of the fair market value. In effect, by warehousing, a savings and loan association can finance 100 percent of the acquisition of unimproved property. Warehousing agreements can be utilized in conjunction with take-out commitments. Investment in section 6705 CFC property is limited to five percent of the savings and loan association's net worth. In addition, real property purchased pursuant to section 6705 CFC, other than a lessor's interest pursuant to section 6705.3 CFC, *307 may not be held by an association for more than five years, except with the approval of the state savings and loan commissioner. In 1962, petitioner purchased a 60-acre tract of unimproved real estate known as the Wildcat Canyon property for $260,000. The property was located approximately 100 miles from petitioner's principal office. At about the time of the purchase, petitioner entered into a take-out loan commitment and repurchase agreement with Michael Grayson (Grayson), a developer. Under the take-out loan commitment, petitioner obligated itself for nine months from September 14, 1962, to accept applications for 25 conventional construction loans to be drawn on the following terms: $24,000.00 per loan/per lot 6 3/4 percent interest rate 24-year monthly amortized term. Under the repurchase agreement, Grayson was to pay $272,000 by May 15, 1963, and meet certain other conditions including depositing $500,000 with petitioner. Petitioner made no construction loans pursuant to the take-out loan commitment. In addition, Grayson neither purchased the property nor deposited $500,000 on account with petitioner. In a letter dated May 2, 1963, petitioner informed Grayson that *308 he was in default under the agreement. Nevertheless, petitioner agreed to honor the agreement and sell the property to Grayson if he tendered $272,000 plus delinquent interest on the promised $500,000 by May 15, 1963. However, Grayson again failed to perform under the agreement. In a letter dated September 4, 1963, petitioner advised Grayson that the property would be sold on the open market, and that any obligations between the parties were deemed terminated. In 1964, the Federal Home Loan Bank Board (FHLBB) conducted an examination of petitioner as of close of business August 28, 1964. The FHLBB report of the examination characterized the Wildcat Canyon property as real estate owned for development (section 6705 CFC property), rather than as real estate owned as a result of foreclosure (section 6707 CFC property). In addition, the report noted under the heading of "STATEMENT OF MANAGEMENT RELATIVE TO PROPOSED USE OF UNIMPROVED LAND: Wildcat Canyon to be held until it can be sold for at least $275,000." In a report of examination prepared by the office of the savings and loan commissioner of the State of California, as of December 7, 1964, the Wildcat Canyou property was *309 described as real property acquired under section 6705 CFC and not as real estate acquired by foreclosure. The examiner found that petitioner's investment of $260,000 in the Wildcat Canyon property exceeded the actual value of the property by $167,000. The report noted that petitioner was negotiating with J. C. and Elizabeth Gamm (Gamms), in-laws of Kersting and citizens of Germany, to transfer the Wildcat Canyon property to the Gamms as partial consideration for the Gamms' transfer to petitioner of unimproved real property known as the Malibu Springs Ranch. The Gamms had acquired the Malibu Springs Ranch property on November 2, 1964, from John W. and Fern T. Roda (Rodas). The purchase price was $600,000 of which $60,000 was to be paid in escrow, and the balance of $540,000 was paid by a promissory note dated November 27, 1964. At no time during the transactions involving Wildcat Canyon and Mailbu Springs Ranch did the Gamms have any of their own money invested. Rather, a "double escrow" arrangement was utilized whereby the Gamms would use funds received from petitioner in the subsequent transfer of Malibu Springs Ranch to satisfy the $60,000 cash payment made to the Rodas. The *310 note was secured by a pledge of the Mendocino Financial Corporation stock owned by Kersting. The note was not secured by a deed of trust. In a take-out commitment dated November 24, 1964, and executed pursuant to the agreement for sale of Malibu Springs Ranch, Mendocino Financial Corporation agreed to purchase from the Rodas the $540,000 promissory note on the occurrence of certain conditions, including default. On December 4, 1964, the Executive Committee of petitioner adopted a resolution authorizing the dispersal of $95,000 to the Gamms. Sixty thousand dollars was in the form of a cashier's check made out to the Gamms and delivered to Kersting upon Kersting's verbal authorization. The remaining $35,000 was in the form of petitioner's own bank check, again made out to the Gamms. Neither check was secured by any collateral. On December 30, 1964, the Gamms transferred the Malibu Springs Ranch property to petitioner by duly recorded deed. In exchange, petitioner transferred to the Gamms the following: Wildcat Canyon Property - value
allowance
$265,000
Agreements to sell- six parcels
of Association REO
3,922
Cash
191,078
Total Purchase Price
$460,000
*311 The Wildcat Canyon property was transferred by duly recorded deed dated December 30, 1964. REO (real estate owned) is classified as a "scheduled item" on a savings and loan association's balance sheet. Scheduled items play a significant role with respect to Federal and state regulations. The regulations of the Federal Home Loan Bank Board and the California Department of Insurance prohibited a savings and loan association from making loans on property located more than 50 miles from its principal office if the ratio of scheduled items exceeded four percent of the association's specified assets, i.e., cash, total loans, and certain other assets, exclusive of reserves. In addition, scheduled items had the effect of decreasing an association's net worth and required an increase in loss reserves. If the ratio of net worth to savings capital fell below five percent, the association could no longer accept savings capital. In September, 1965, petitioner purchased the Wildcat Canyon property back from the Gamms for $175,725.50. The purchase was negotiated on both sides by Kersting. Jack Bernard, petitioner's then president, sent a memorandum dated September 21, 1965, to the Board *312 of Directors stating that he approved of the repurchase because of the opportunity to reduce scheduled items. Petitioner's Board of Directors approved the repurchase of Wildcat Canyon which was executed by duly recorded deed dated September 28, 1965. The purchase price consisted of $25,000 cash and the grant of "other property" to the Gamms. Petitioner's books show costs attributable to the reacquisition of Wildcat Canyon and properly chargeable to the capital account in the amounts of $175 and $250. Less than one month after the reacquisition of the Wildcat Canyon property, E. P. Brodd (Brodd), an M.A.I. appraiser, appraised the property at $150,000.Brodd's appraisal noted that there was no activity for development planned by any of the owners of property located in the Wildcat Canyon area "in the immediate future." At the time of the purchase, petitioner had no plans for development of the Wildcat Canyon property and knew that prospects for developing loans in the area were not good. Petitioner was also aware, before the reacquisition, that at least one other savings and loan association had managed to devest itself of property located in the Wildcat Canyon area. In a letter *313 dated September 7, 1965, from John J. Goodwin, Executive Vice President of City Savings and Loan Association of San Francisco, to Jack Bernard, petitioner's then president, Mr. Goodwin outlined the terms of the sale and stated: Needless to say we were pleased with the way it turned out for us and we surely hope you will find the same wonderful relief yourselves. During petitioner's original holding period of the Wildcat Canyon property from 1962 to 1964, petitioner did not make any physical improvements to the property, make any loans on the security of the property or take any steps toward development of the property. Similarly, from 1965 to 1974, petitioner did not make any physical improvements to the property, make any loans on the security of the property and did not develop the property. On June 14, 1966, petitioner entered into a three-year oil and gas lease on the Wildcat Canyon property with Standard Oil Company of California. On June 9, 1969, petitioner extended the terms of the lease for six years. On February 15, 1967, the State of California purchased 1,180 acres in the Wildcat Canyon area, adjacent to petitioner's property, for $1,787,000 (approximately $1,500 *314 per acre). The purpose of the purchase was to acquire additional parkland for the state. The purchase effectively landlocked petitioner's Wildcat Canyon property. Thereafter, egress and ingress to petitioner's property were available only by way of crossing state parkland, and only when the park was open. On July 21, 1967, petitioner was required by the California Division of Savings and Loan (CDSL) to write down on petitioner's books the value of the Wildcat Canyon property to $84,000. In a subsequent order dated August 24, 1967, the CDSL commanded petitioner to cease immediately all investment activities under the provisions of section 6705 CFC. The FHLBB issued a similar order in November, 1968. By book entry dated December 6, 1968, the Wildcat Canyon property was further written down to $60,000. Ira N. Brannon (Brannon) served as president and managing officer of petitioner from November 6, 1967, until April 1, 1976. Brannon was recruited for petitioner by Kersting, and hired by the association's Board of Directors, because of his expertise in the field of savings and loan regulations. In effect, Brannon was hired to come in and straighten out petitfioner's affairs. *315 At the time that Brannon took office, petitioner had been prevented from accepting any new deposits for almost six months because petitioner's not worth to savings capital ratio had dipped below five percent. In December, 1967, Kersting as well as several directors of petitioner were ousted from their positions of control. Sometime prior to December, 1967, Kersting had pledged to the Central States Southeastern, Southwestern Pension Fund the stock of petitioner as security on a 1.5 million dollar loan from the pension fund to Mendocino Financial Corporation. Mendocino Financial Corporation defaulted on the loan payments and subsequently declared bankruptcy. Representatives of the Pension Fund attended a regularly scheduled Board of Directors' meeting of petitioner and presented presigned resignations of certain directors. Other directors at the meeting were given resignations and told to resign. Brannon was kept on in his position because it was felt by the Pension Fund's representatives that he had not been there long enought to have caused any of the existing problems. With the change in management, activity with respect to selling the Wildcat Canyon property began to increase. *316 Between 1968 and 1972 at least five separate individuals were contacted in an attempt to negotiate a sale. In addition, the Wildcat Canyon property was listed for sale with Ornbaum-Cox Realty on March 21, 1969. In 1974 petitioner ultimately sold the Wildcat Canyon property to the California State Park Authority for $55,349. In connection with the sale, petitioner incurred selling expenses of $1,314. Petitioner reported an ordinary loss of $122,116 on the sale of the Wildcat Canyon property. The amount of the loss so reported was the difference between the net cost to petitioner in the 1965 reacquisition from the Gamms and the net proceeds from the sale in 1974. In the notice of deficiency, respondent determined the loss to be a capital loss. OPINION Petitioner first acquired the real property, known as Wildcat Canyon, in 1962 for $260,000. At about that time, petitioner entered into a take-out loan commitment and repurchase agreement with an unrelated third-party developer, Grayson. The agreement with Grayson was never fulfilled due to Grayson's default. Subsequently, petitioner conveyed Wildcat Canyon to the Gamms in 1964 as partial consideration for the Gamms' transfer *317 of the Malibu Springs Ranch property to petitioner. The value of Wildcat Canyon credited to petitioner in the exchange was $265,000. Petitioner reacquired the Wildcat Canyon property from the Gamms in 1965 for $175,725.50. In 1974 petitioner sold the Wildcat Canyon property to the State of California for $55,349. Petitioner sustained a loss on the sale which was reported as an ordinary loss of $122,116 on its 1974 Federal income tax return. The issue for decision is the character of the loss sustained by petitioner on the sale of the Wildcat Canyon property in 1974. Petitioner contends that the Wildcat Canyon property was held by petitioner for sale to its customers in the ordinary course of business, thereby falling within the section 1221(1) exception to the definition of capital assets. Consequently, petitioner seeks to have this Court characterize the resulting loss on the sale of the property in 1974 as an ordinary loss. To support its contention, petitioner argues that the Wildcat Canyon property was acquired in 1962 for the purpose of generating loans to itself. Although subsequent events frustrated this purpose, petitioner's intention regarding the property was *318 not altered, and therefore the property was acquired, held and sold in the ordinary course of its business. Conversely, respondent contends that the property was acquired in 1965 when transferred to petitioner by the Gamms and that the facts and circumstances surrounding such acquisition clearly demonstrate that petitioner acquired, held and sold the property as a capital asset. Alternatively, even if this Court were to find that the property was acquired in 1962 in petitioner's ordinary course of business, such reasons for the acquisition had ceased to exist by 1963. Thereafter, petitioner held and sold the property as a capital asset. Consequently, the loss sustained on the subsequent sale should be a capital loss. After a careful review of the record before us, we are convinced that petitioner did not hold the property for sale to customers in the ordinary course of its trade or business. Accordingly, we agree with respondent that petitioner sustained a capital loss rather than an ordinary loss on the sale of the Wildcat Canyon property in 1974. To characterize the loss, we must look to the definition of a capital asset. *319 Section 1221 provides in pertinent part as follows: * * * the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Whether a particular property falls within the exception is a factual question involving consideration of all the relevant facts and circumstances. Higgins v. Commissioner,312 U.S. 212 (1941); Redwood Empire Savings & Loan Association v. Commissioner,68 T.C. 960, 971 (1977), affd. 628 F.2d 516 (9th Cir. 1980); South Texas Properties Co. v. Commissioner,16 T.C. 1003, 1009 (1951). As explained in Malat v. Riddell,383 U.S. 569, 572 (1966): The purpose of the statutory provision * * * is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand [citation omitted] and "the realization of appreciation in value accrued over a substantial period of time" on the other. [Citation omitted.] * * * We hold that, *320 as used in § 1221(1), "primarily" means "of first importance" or "principally." In Adam v. Commissioner,60 T.C. 996, 999 (1973), the Court listed the following factors to be used in determining whether a particular property falls within the exception: (1) The purpose for which the asset was acquired; (2) the frequency, continuity, and size of the sales; (3) the activities of the seller in the improvement and disposition of the property; (4) the extent of improvements made to the property; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held during the taxable year. * * * [Citation omitted.] No one factor is conclusive, but rather the totality of the facts in each individual case controls. Ayling v. Commissioner,32 T.C. 704, 708 (1959). Applying the facts in this case to the Adam factors necessitates the conclusion that the Wildcat Canyon property was not held in the ordinary course of petitioner's trade or business. We will address in order those factors *321 relevant to this case. Initially, we must determine which of the two dates before us, 1962 or 1965, is the appropriate acquisition date to which an analysis of petitioner's purpose for acquiring the property may be applied. For the reasons stated below, we find 1965 to be the relevant date. Resolution of this question is dependent upon whether a sale or exchange occurred between petitioner and the Gamms, first in 1964 and again in 1965. The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). The key to the question of whether petitioner's transactions with the Gamms constituted a sale or exchange is a determination of whether the benefits and burdens of ownership of the Wildcat Canyon property passed from petitioner to the Gamms in 1964 and then back to petitioner in 1965. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in *322 light of the attending facts and circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). Various factors which have been considered by courts in making a determination as to whether a sale occurs were summarized in Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981): (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits [or loss] from the operation and sale of the property. [Citations omitted.] Application of those factors relevant to this case compels the conclusion that both the 1964 and the 1965 transactions constituted sales. *323 [3] Legal title to the Wildcat Canyon property was transferred from petitioner to the Gamms by duly recorded deed dated December 30, 1964. Subsequently, the Gamms transferred the property back to petitioner by duly recorded deed dated September 28, 1965. Both transactions involved valuable consideration passing between the parties. Possession of the property was delivered as of the close of escrow. Property taxes were pro-rated as of the close of escrow, and subsequent tax bills on the Wildcat Canyon property were to be sent to petitioner as indicated on the 1965 deed of conveyance. Furthermore, all correspondence between petitioner and the California State authorities, Federal Home Loan Bank Board and prospective purchasers of the Wildcat Canyon property which makes reference to an acquisition date of the property by petitioner utilizes the 1965 date. Moreover, in reporting the amount of the loss sustained on its 1974 income tax return, petitioner utilized the 1965 *324 acquisition date figures for computation purposes. Accordingly, we conclude that 1965 was the year of acquisition of the Wildcat Canyon property by petitioner for purposes of determining gain or loss on the sale in 1974. The totality of the facts surrounding the acquisition of the Wildcat Canyon property in 1965 demonstrates that petitioner did not acquire the Wildcat Canyon property in the ordinary course of its trade or business. First, the evidence reveals that in 1965 prospects were remote that the property could be developed before at least 10 years had elapsed. Robert Kauffman, an officer of petitioner in 1965, testified that the potential for generating loans from the Wildcat Canyon property in 1965 was virtually non-existent. Brodd, an appraiser hired by petitioner in 1965 to value the property, noted that no development activity was planned in the immediate future. Moreover, prior to petitioner's reacquisition of the Wildcat Canyon property, at least one other owner of the property in the area had indicated to petitioner his "relief" at selling his holdings. Second, it is obvious from the record that petitioner's transfer of the Wildcat Canyon property to the Gamms *325 in 1964 and the acquisition of the property from the Gamms in 1965 was part of a continuing scheme to indirectly and improperly siphon funds from petitioner to Kersting via the Gamms. Such distributions were accomplished by means of multiple sales transactions between petitioner and the Gamms involving the Malibu Springs Ranch property and the Wildcat Canyon property, all of which transactions were orchestrated by Kersting. The acquisition of the Wildcat Canyon property as a part of such scheme is not consistent with the concept of property held by a taxpayer primarily for sale to its customers in the ordinary course of trade or business. The series of sale transactions referred to began in November, 1964, when the Gamms purchased the Malibu Springs Ranch property from the Rodas for $60,000 cash down and a $540,000 promissory note. The cash for the down payment was obtained from petitioner upon Kersting's verbal authorization. The note was secured by a pledge of the Mendocino Financial Corporation stock owned by Kersting. Sometime prior to December, 1967, Kersting used stock in Redwood Empire Savings and Loan Association held by Mendocino Financial Corporation to secure a 1.5 *326 million dollar loan to Mendocino Financial Corporation from the Central States Southeastern, Southwestern Pension Fund. The Redwood Empire Savings and Loan stock was Mendocino Financial Corporation's major asset.It cannot be determined from the record whether the pledge of Redwood Savings and Loan stock to the Pension Fund was made before or after the pledge of Mendocino Financial Corporation stock to the Rodas. In any event, the Rodas received interest only on the note until sometime in 1967, when default on the note occurred. At that time, the Pension Fund had already foreclosed on the stock of Redwood Empire Savings and Loan because of Mendocino Financial Corporation's default on the 1.5 million dollar loan. That foreclosure caused the bankruptcy of Mendocino Financial Corporation, leaving the Rodas with worthless stock of Mendocino Financial Corporation as the only security for the Gamm note. Within a month after using petitioner's funds to acquire the Malibu Springs Ranch property, the Gamms transferred the Malibu Springs Ranch to petitioner. In exchange, petitioner transferred to the Gamms the Wildcat Canyon property and $191,078 in cash, and agreed to sell other REO (real *327 estated owned) to the Gamms. Nine months later, petitioner bought back the Wildcat Canyon property from the Gamms for $175,725.50, the consideration consisting of $25,000 in cash and the balance by grant of other property to the Gamms. Just one month later, Brodd appraised the Wildcat Canyon property at $150,000. In Redwood Empire Savings & Loan Association,68 T.C. 960 (1977), affd. 628 F.2d 516 (9th Cir. 1980), we held that the Malibu Springs Ranch property was not property held by petitioner primarily for sale to customers in its ordinary course of business. 68 T.C. at 975. The Court examined the petitioner's purpose for acquiring the Malibu Springs Ranch property and determined that: After that transaction the Gamms (or Kersting) had $750,000 of petitioner's cash, the Rodas had received only $60,000 of their sales price from the Gamms (or Kersting), and petitioner owned the Malibu Springs Ranch for which it had paid a price apparently far in excess of its value. Looking at the above transactions objectively suggests that the principal purpose for the acquisition of the property by petitioner was to permit Kersting to bilk the *328 Rodas out of their property for $60,000 and to permit Kersting to withdraw $750,000 in cash from petitioner in exchange for the property for which he had actually paid only $60,000. 68 T.C. at 973. Likewise, here the Wildcat Canyon property was used by Kersting as an integral part of facilitating cash withdrawals from petitioner. In sum, based on the objective facts surrounding the transactions pertaining to the Wildcat Canyon property, we conclude that petitioner's purpose in acquiring the Wildcat Canyon property in 1965 was to accommodate Kersting, not an activity engaged in by petitioner in the ordinary course of its business. Other factors listed in Adam are equally detrimental to petitioner's argument. There is no evidence that petitioner frequently and continuously engaged in sales of section 6705 CFC properties such that petitioner could be said to be in the business of selling real estate. Moreover, the evidence is uncontradicted that petitioner did not develop the property, make loans on the property or make any physical improvements to the property. While there is evidence that petitioner attempted to sell the property by listing it with a realty *329 company and through correspondence with prospective purchasers, this level of activity is more consistent with an intention to dispose of a bad investment than with marketing activities in the ordinary course of business. The activities associated with the Wildcat Canyon property over the nine-year holding period from 1965 to 1974 were essentially part of a salvage operation to minimize the potential loss from a poor investment. As petitioner's own expert candidly stated: But we tried to accept, to salvage, if you will, something for what we had in there. And there's no ifs, ands or buts, the Association notwithstanding had $265,000 in that property. And would be getting [$55,000]. Finally, there is no evidence that petitioner's reason for holding the property ever changed, such that it could be said petitioner was holding the property in the ordinary course of its business on the date of sale.The reason for holding the property at the time of sale is determinative of the tax treatment to be afforded that sale. Biedermann v. Commissioner,68 T.C. 1, 11 (1977), appeal dismissed (4th Cir. 1978); Maddux Construction Co. v. Commissioner,54 T.C. 1278, 1286 (1970). *330 Petitioner's reliance on Burbank Liquidating Corporation v. Commissioner,39 T.C. 999 (1963), affd. in part and revd. on other grounds, 335 F.2d 125 (9th Cir. 1964), in support of its position is misplaced. In that case we held that the taxpayer's gain on the sale of lots from property acquired under section 6705 CFC was ordinary income rather than capital gain. However, we found as a fact in that case that the taxpayer originally acquired the property for sale in the ordinary course of business and that this intent was not altered prior to the sale of property. 39 T.C. at 1010. Petitioner's reliance on Girard Trust Corn Exchange Bank v. Commissioner,22 T.C. 1343 (1954), is also misplaced. Petitioner argues that the default of Grayson with respect to the agreements associated with the acquisition did not alter petitioner's intention regarding the property. Instead, petitioner asserts that Grayson's default resulted in a "kind of foreclosure" in which petitioner deemed terminated all obligations between the parties. There was no need for petitioner to foreclose on the property because it already held title to *331 the property. Nevertheless, petitioner contends that the effect of terminating its obligations with Grayson was tantamount to acquiring property in foreclosure and should therefore receive analogous treatment. In Girard, we held that real estate acquired by a bank in foreclosure or by deed in lieu of foreclosure was thereafter held by it for sale to customers in the ordinary course of business. However, regardless of the merits, if any, of petitioner's argument that its 1962 acquisition of the property resulted from a de facto foreclosure, such argument is irrelevant since we have held that petitioner's motive for acquiring and holding the property derives from the 1965 acquisition and not the 1962 acquisition. Petitioner also argues that no effect should be given to the transactions between petitioner and the Gamms in 1964 and 1965 because their purpose was merely to cause favorable adjustments to petitioner's balance sheet by reducing scheduled items. Petitioner's position is that changes in Federal and state law governing savings and loan associations made it more onerous than before to hold REO (real estate owned) property. REO is classified as a "scheduled item" on *332 a savings and loan association's balance sheet. Scheduled items play a significant role with respect to compliance with Federal and state regulations. The regulations of the Federal Home Loan Bank Board and the California Department of Insurance prohibited a savings and loan association from making loans on property located more than 50 miles from its principal office if the ratio of scheduled items exceeded four percent of the association's specified assets; i.e., cash, total loans and certain other assets, exclusive of reserves. In addition, scheduled items have the effect of decreasing an association's net worth and require an increase in loss reserves. If the ratio of net worth to savings capital falls below five percent, the association may no longer accept savings capital. Petitioner contends on brief that: These changes in the law suggest the only possible motivation for Redwood's sale and repurchase of the Wildcat Canyon property in 1964 and 1965. By conveying the property (valued at $265,000.00) in exchange for the Malibu Springs Ranch (valued at $460,000.00), Redwood increased its assets by $195,000.00. Petitioner's argument is deficient in several respects. First, *333 petitioner ignores the fact that $191,078 in cash was paid to the Gamms on the transfer, a significant negative impact on petitioner's balance sheet. Second, the Malibu Springs Ranch property was also REO property and thus would have the same impact as the Wildcat Canyon property on petitioner's balance sheet. Third, as already noted, the more plausible explanation for the transactions between petitioner and the Gamms was to enable Kersting to withdraw cash from petitioner. Alternatively, petitioner contends that the 1964 and 1965 transactions should be disregarded in determining the nature and purpose of petitioner's ownership of the Wildcat Canyon property because of the self-dealing between Kersting and the Gamms. Petitioner contends that because Kersting, the controlling shareholder and chief executive officer, was negotiating the transactions between petitioner and related parties--his in-laws--the transactions themselves did nothing more than create a constructive trust for the benefit of petitioner. Section 5613 CFC prohibits a savings and loan association from dealing directly or indirectly with its directors or majority shareholders, and since Kersting was both the majority *334 shareholder and a director of petitioner, his dealing with his in-laws, the Gamms, was in violation of section 5613 CFC. As a result, that violation triggers the application of section 2224 CCC (California Civil Code) which would have imposed a constructive trust on the Gamms for the benefit of petitioner. Petitioner therefore concludes that the transaction was without substance and should be disregarded in determining the nature and purpose of petitioner's ownership of the Wildcat Canyon property. Petitioner's argument is not supported by case law or logic. First, it is clear from the record that the California savings and loan commissioner examined petitioner as of December 7, 1964, and was aware of the proposed exchange. No question of a violation of section 5613 CFC was raised in the report or anywhere else in the record outside of petitioner's argument. Second, even if the transfer was a violation of section 5613 CFC, the transaction was merely voidable, not void. King v. Mortimer,233 P.2d 4, 6-7 (1951). Third, as already noted, applying the factors enumerated in Grodt and McKay Realty, Inc.,supra, to the facts and circumstances surrounding *335 the 1964 and 1965 transactions necessitates the conclusion that sales actually occurred. Ultimately, petitioner's case boils down to the proposition that because an individual, Kersting, utilized his dominating position with petitioner to serve his own personal purpose rather than business purposes of petitioner, petitioner should be relieved of the tax consequences of those acts. But petitioner's real quarrel is then with Kersting, not respondent, and it is not the function of this Court to redress petitioner's grievances with Kersting at the expense of the public fisc. We hold that petitioner acquired, held and sold the Wildcat Canyon property as a capital asset in 1965 and that the loss sustained by petitioner on the sale of the property in 1974 was a capital loss. In its reply brief, petitioner asserts briefly, and for the first time, that the $95,000 advanced by petitioner in connection with the Malibu Springs Ranch acquisition should for some unexplained reason be added to petitioner's Wildcat Canyon property cost basis. If petitioner is serious about this point, it has been raised in an untimely and wholly inadequate manner, and we decline to consider it. We accept *336 the amount of the loss as reported on petitioner's 1974 return; i.e., $122,116. To reflect the foregoing, Decision will be entered for the respondent in docket No. 11950-77.
Appropriate orders will be entered in docket Nos. 11948-77 and 11949-77.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Financial Savings and Loan Association of Northern California, Successor-In-Interest to Redwood Empire Savings and Loan Association, docket No. 11949-77; and Financial Savings and Loan Association of Northern California (formerly Redwood Empire Savings and Loan Association), docket No. 11950-77.↩
2. All section references are to the Internal Revenue Code of 1954 in effect for the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Technically, the transfer of the Wildcat Canyon property for the Malibu Springs Ranch property constituted an exchange, but in the context of section 1221(1)↩ the terms "sale" and "exchange" are synonymous.