CHARLES R. GANGI AND MARY C. GANGI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CARL R. MAGINN AND CHARLOTTE R. MAGINN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gangi v. Commissioner
Docket Nos. 38613-84; 38614-84.
United States Tax Court
T.C. Memo 1987-561; 1987 Tax Ct. Memo LEXIS 553; 54 T.C.M. (CCH) 1048; T.C.M. (RIA) 87561; November 9, 1987; As amended November 9, 1988 Richard Van Name, for the petitioners. Howard Rosenblatt, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Amount
Charles R. Gangi and Mary C. Gangi
1979
$ 202,845
docket No. 38613-84
1980
7,961
$ 210,806
Carl R. Maginn and Charlotte R. Maginn
1979
$ 118,691
docket No. 38614-84
1980
29,488
$ 148,179
These cases were consolidated for trial, briefing and opinion. The sole issue for determination is whether petitioners realized capital gain or ordinary income from the sale as condominium units of a building previously held for rental of apartments. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by reference. Petitioners Charles R. Gangi and Marcy C. Gangi ("Gangi or Gangis") resided in Glendale, California, when they filed their petition. Petitioners Carl R. Maginn *555 and Charlotte R. Maginn ("Maginn or Maginns") resided in Glendale, California, when they filed their petition. Each of the petitioners was separately in the business of constructing and selling single family homes and in some cases apartment buildings. From time to time, Gangi and Maginn independently constructed or purchased property which each held as rental property for investment. None of such property is at issue in this case. In 1970, Maginn and Gangi formed a partnership. This was the first time that they did business together. The partnership constructed a 36-unit apartment building in Glendale, California ("building") which was completed in November 1970. The building was the partnership's only asset. The partnership constructed the building in a superior manner, using top quality materials more commonly found in the construction of single family homes. They intended to keep the building as a retirement investment and therefore wanted it to remain in good condition for a number of years. From November 1970 to August 1978, the property was held solely as rental property. The partnership hired a resident property manager to handle the daily operations of the building, *556 and consequently, the building did not require much daily supervision from Gangi or Maginn. Petitioners' role with respect to the operation was that of general manager, and Gangi and Maginn switched off every other year in that position. The cost to the partnership for the construction of the building was $ 666,083 of which $ 559,388 was allocable to the building and $ 106,695 to the land. The annual gross income from the building to the partnership was $ 113,389 in 1976, $ 116,293 in 1977 and $ 82,852 in 1978. The net rental income before depreciation and payments to the general partners was $ 47,664 in 1976, $ 44,311 in 1977 and $ 1,598 in 1978. In June 1977, Maginn and Gangi no longer wished to remain partners and contemplated selling their building and liquidating their investment. They determined that converting the building to condominium units and listing them for sale would be the most profitable way to liquidate their investment. The building was not generating enough rental income to justify its sale as a rental building from an economic perspective. From June 1977 to August 1978, conversion engineering and legal work to convert the 36 unit apartment building *557 to 36 condominium units was authorized and completed. In connection with the conversion of the building, the partnership incurred expenses totalling $ 29,220.51. These expenses included: Designs, plans and maps
$ 1,385,33
Engineering costs
7,605.62
Fees and permits
350.00
Title and legal fees
3,922.00
Dept. of Real Estate
100.00
Bonds
1,010.00
Expense for model
3,987.90
Brochures
859.66
Acceptance fee (bank charge)
10,000.00
Total
$ 29,220.51
An additional $ 100,163.93 in expenses, which would have been incurred by the partnership whether the building was sold as a whole, prior to conversion, or as condominium units, are itemized as follows: Hardware, lumber, misc.
$  15,048.09
Painting
4,319.73
First floor paving
1,250.00
Labor, misc.
28,675.15
Fixtures
709.03
Flooring/carpeting
32,036.35
Masonry art
3,500.00
Ms. Kay Interior
6,859.48
Landscaping
1,664.10
Awning
1,102.00
Commission
5,000.00
Total
$ 100,163.93
No structural changes were made to the units themselves and no work was done to the building that would require a building permit. Beginning in September 1978, the units *558 were listed for sale pursuant to an exclusive listing agreement with an independent real estate company, Greg Gangi Realty. Greg Gangi Realty was owned by Sal Gangi, Gangi's brother and John Greg, a longtime builder and real estate broker from the Glendale area. John Greg is unrelated to either Gangi or Maginn. The partnership interviewed other real estate companies but contracted with Greg Gangi Realty based on their low 1 3/4 percent commission and their prior activity in the relatively new condo market. The sale of the units was advertised in the Glendale News Press. Sales brochures advertising the units were also printed. The real estate company used one of the units as a model unit and placed a salesperson there during normal business hours to market and sell the units. Neither Gangi or Maginn ever carried on any selling activities. During 1979, the partnership sold 26 of the 36 individual condominium units to 26 different purchasers for a total gross sales price of $ 1,716,295. In late 1979, four units each were distributed to Gangi and Maginn. The final two units were sold by the partnership in individual transactions to two unrelated buyers in March 1980 for a total *559 gross sales price of $ 143,000. In November 1979, Gangi sold three of his four condominium units for a gross sales price of $ 255,000. The fourth unit was held as rental property in 1979 and 1980. All four of Maginn's units were held as rental property in 1979 and 1980. The partnership was liquidated in March 1980 after the sale of the last condo on March 21, 1980. Gangi and Maginn never constructed or acquired another rental apartment building which was converted into condominium units for sale, other than the property in question. Gangi and Maginn never carried on business activities with each other after the liquidation of the partnership. Gangi reported a long-term capital gain of $ 379,172 on his 1979 tax return, representing his share of the partnership's long-term capital gain. The remained of the partnership's long-term capital gain, $ 379,172, was reported on Maginns' 1979 return. Each petitioner also reported his allocable share of the $ 85,515 ordinary income on his respective 1979 returns. On the 1980 tax returns, the partnership reported a long-term capital gain of $ 101,089 from the sale of the remaining condominium units, and Gangi and Maginn reported $ *560 19,818 and $ 81,271, respectively, of the $ 101,089 capital gains on their 1980 tax returns. OPINION The sole issue is whether Gangi and Maginn realized capital gain or ordinary income from the sale of the condominium units. If the partnership held the units primarily for sale to customers in the ordinary course of its trade or business pursuant to section 1221(1) or 1231(b)(1)(B), [1] any gain realized on their sale will be taxed as ordinary income. If the partnership held the units for investment, the resulting gain will be capital gain. Malat v. Riddell,383 U.S. 569, 572 (1966). For realization of ordinary income, the property must first be held primarily for sale, and second, for sale in the ordinary course of business. Howell v. Commissioner,57 T.C. 546, 555 (1972). The word primarily has been interpreted to mean "principally" or "of first importance." Malat v. Riddell, supra. *561 In determining this issue, we have considered cases interpreting section 1221(1) to be authority for section 1231(b)(1)(B) cases. Cottle v. Commissioner, 89 T.C.    (1987) (slip opinion at 30-31). Finally, we must construe the statute providing capital gains treatment narrowly, as it is a relief provision and an exception to the normal tax rates. Commissioner v. P. G. Lake, Inc.,356 U.S. 260, 265 (1958); Corn Products Co. v. Commissioner,350 U.S. 46, 52 (1955). The the instant case, respondent argues that converting the 36-unit apartment building into individual units and the subsequent sale of the units constituted a shift from an investment/rental operation to sale in the ordinary course of business, and that this resulted in Gangi and Maginn realizing ordinary income in 1979 and 1980. Petitioners counter that their primary intention in converting the building and selling the units was to liquidate their investment and terminate the business, a business decision necessitated by the Glendale real estate market and a desire by Gangi and Maginn to go their separate ways. Petitioners, accordingly, seek long-term capital gain treatment *562 for any sales proceeds from the units. They bear the burden of proving that they dealt with the units as investors and not as dealers. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Neither party argues that it is impermissible for people in the business of selling real estate to have separate designated investments that do not fall into the ordinary income category. Maddux Construction Co. v. Commissioner,54 T.C. 1278, 1284 (1970). We conclude that Gangi and Maginn did not hold the building "primarily" for sale to customers in the ordinary course of business. They purchased the land and built the building as a retirement investment, and for 8 to 9 years rented the units in accordance with their initial investment motive. When for business and personal reasons they determined it was in their best interest to sell, a business judgment was made to convert the building to condominiums. This decision was made in connection with their investment in real estate, and not in the ordinary course of a business. While we are aware that the purpose for which a taxpayer originally holds the property is not determinative of how the gain from a subsequent *563 sale will be treated for tax purposes, it is nevertheless an important factor to be considered. Jersey Land and Development Corp. v. United States539 F.2d 311, 315 (3d Cir. 1976); Ehrman v. Commissioner,120 F.2d 607, 610 (9th Cir. 1941); Daugherty v. Commissioner,78 T.C. 623, 629 (1982); Biedermann v. Commissioner,68 T.C. 1, 11 (1977). Thus, while we concede that Gangi and Maginn "sold" the condominium units, we do not think that this activity rises to the level of holding property "primarily" for sale to customers. Petitioners' original intent is relevant for our purposes under all the facts and circumstances. Based on the law as articulated by the Ninth Circuit, the circuit to which this case is appealable, see Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we also determine that Gangi and Maginn were not selling units in the ordinary course of their trade or business. In determining this issue, no one factor is controlling, each case turns on its own particular set of facts and circumstances. *564 Parkside, Inc. v. Commissioner,571 F.2d 1092, 1096 (9th Cir. 1977); Austin v. Commissioner,263 F.2d 460, 462 (9th Cir. 1959). Courts have, however, considered the following factors more heavily to determine this issue: the nature of the acquisition of the property, the frequency and continuity of sales over an extended period, the nature and the extent of the taxpayer's business, the activity of the seller about the property, and the extent and substantiality of the transactions. Redwood Empire S & L Assoc. v. Commissioner,628 F.2d 516, 517 (9th Cir. 1980).
See Parkside v. Commissioner, supra at 1096; Austin v. Commissioner, supra at 462. For purposes of our discussion, we will discuss only those factors we find relevant. Respondent urges us to conclude that Gangi and Maginn sold the units in the ordinary course of their trade or business based on the above list of factors. Respondent points to petitioners' activities in connection with the conversion including the substantial sales, the advertising to increase the sales, the model condominium unit, and the overall involvement of the partnership *565 with the conversion process. Specifically, respondent notes that 1) the partnership sold twenty-six units to twenty-six different purchasers during 1979 and two units to two purchasers in 1980; 2) the partnership expended $ 129,384.44 to convert the building into condominium units; 3) the partnership advertised the sale of the condominium units in a local newspaper; 4)the partnership opened a model unit 6 days a week from noon to 5 p.m. to facilitize the sales; and, finally, 6) that the partnership received more money as a result of the conversion of the building into condominium units than it would have received had the building been sold intact. Respondent, thus, argues that Gangi and Maginn's efforts to sell the units rise to the level of producing sales in the ordinary course of a trade or business. Petitioners view the transaction differently. In 1970, Gangi and Maginn formed a partnership, which constructed the building for investment purposes. November 1970 to August 1978, the property was held solely as rental property. In June 1977, petitioners no longer wished to remain as partners, and they concluded that a conversion to condominiums would be the most profitable *566 way for them to liquidate their investment. Maginn testified that the Glendale real estate market for rental real property had declined. Moreover, the building was "showing a relatively poor return * * *." Confronted with the desires to terminate the partnership and a poor market to sell rental real estate, they decided the addtional expenditures to convert the building were worthwhile. Two cases in particular lead us to the result that petitioners are entitled to capital gain treatment on their gains from the sale of the condominium units. In Heller Trust v. Commissioner,382 F.2d 675, 680 (9th Cir. 1967), the court held that where the facts clearly indicated that the taxpayer held his property as rental/investment property and that "this purpose continued until shortly before the time of a sale, and that the sale is prompted by a liquidation intent, the taxpayer should not lose the benefits provided for by the capital gain provisions." In Heller, the taxpayer sold 169 duplexes (which formerly had been rented) between the years 1955 and 1958. He hired a staff, advertised the sale and opened a model unit in connection with the sales. The Ninth Circuit *567 noted that the situation had changed between the time the taxpayer originally acquired the investment and the time the duplexes were sold. There was a decline in the taxpayer's health and in the economic conditions of the area in general. The court commented that if it followed the lower court's treatment of the duplexes as being for sale in the ordinary course of business, the court could not conceive of "how persons with an investment such as we have here could bring themselves within the purview of the capital gains provisions of the statute where * * * they had to abandon a disappointing investment by means of a series of sales." The court stated that they did not "believe that such a harsh treatment is warranted under the applicable law and the facts of this case." Heller v. Commissioner, supra at 680. We find that petitioners' motives were equally as strong for abandoning their investment. Just as declining health is unanticipated, so is the disintegration of a business relationship between two partners. Moreover, from the testimony of Maginn, it is evident that there was a decline in interest for rental buildings in the Glendale real estate market at *568 the time Gangi and Maginn decided to terminate the partnership, and sell the building. Respondent argues, however, that the Ninth Circuit decided as it did in Heller because the taxpayer "apparently" fell within the "liquidation niche" articulated in Biedenharn Realty Co. v. United States,526 F.2d 409, 416 (5th Cir. 1976). [2] We do not find respondent's argument persuasive. In the first place, Biedenharn was decided 9 years after Heller, so the Ninth Circuit could not have considered Biedenharn in reaching its decision. Furthermore, to the extent that the Ninth Circuit carved out a "niche" in Heller, it is a much broader "niche" than the "externally induced factor" rule articulated in Biedenharn.
*569 We conclude, based on the facts and circumstances of this case, that petitioners fall within Heller's framework. Moreover, it is likely they might fall within the Biedenharn niche as well, although we do not have to find this to decide for petitioners on this issue. Heller is sufficient for our purposes. We also note on Parkside, Inc. v. Commissioner,571 F.2d 1092 (9th Cir. 1977). In Parkside, the Ninth Circuit contemplated whether income from the sale of certain duplexes constituted personal holding company income to the seller-corporations under section 543(b)(3). [3] The Court then turned to section 1221(1) cases for guidance as no cases directly interpreted 543(b)(3). In Parkside, the corporate taxpayers held 47 duplex houses for rent. In light of the fact that expenses were continuously larger than receipts, the taxpayers decided to sell the duplexes rather than to continue to rent them unprofitably. In order to maximize income, it was further decided to sell the duplexes individually rather than as a block. In order to avoid sales difficulties, the taxpayers devised a unique set of criteria for potential purchasers including employment, *570 credit and residence specifications. The duplexes were then advertised for sale. Eventually, a succession of real estate agents was hired who ultimately sold all 47 of the duplexes from January 1965 to October 1966. In connection with the sales, the taxpayer incurred at least $ 50,000 in brokerage fees. The duplexes were sold "as is"; there was no subdivision or improvements. From the date of the sales to the date of trial, the taxpayers acquired no additional real property. Based on these activities, the taxpayers asserted that the duplexes were held primarily for sale in the ordinary course of business and that such income was not personal holding company income. The Ninth Circuit held that the duplexes were held in the ordinary course of business, reversing this Court's opinion to the contrary. *571 Respondent argues that under Parkside, petitioners must recognize ordinary income as they were even more involved with the conversion than the taxpayers in Parkside were with the sale of their duplexes. Respondent dwells on the fact that the partnership spent substantial sums on improvements prior to the conversion and on the conversion itself. Moreover, they find the model unit to be a "crucial" feature of the sales process, along with the advertisements in the local paper and the printed sales brochures. We read the facts differently. In Parkside, the taxpayer argued for ordinary income treatment and testified that the primary holding purpose was for sale in the ordinary course of business. Gangi and Maginn, on the other hand, held the building primarily for rental. Their primary purpose was to liquidate an investment which they held for 8 years as rental property. Moreover, in Parkside, the Ninth Circuit noted the "substantial commitment" of the taxpayer to sales and commented on the "substantial advertising of the sales venture; and the substantial sums expended for brokerage commissions." Parkside v. Commissioner, supra at 1096. Both factors *572 are lacking here. Gangi and Maginn placed advertisements in only one newspaper, the Glendale News Press. The extent of the partnership's advertising to promote the sales totalled $ 4,437. This amount is minimal compared to the gross sales price of the units of $ 2,114,295. Moreover, petitioners paid a low brokerage commission of 1-3/4 percent. Unlike the taxpayer in Parkside, Gangi and Maginn were not substantially involved with the sales end of the condominiums. It must also be noted that the majority of the improvements made to the building prior to sale consisted of maintenance such as painting and carrpeting that would have been necessary even if petitioners continued to hold the building as rental/investment property.[4] No structural changes were made to the units themselves and no state or local permits were required prior to the conversion. We do not find that these activities rise to the level of being in the ordinary trade or business of holding condominium units for sale to customers. See Austin v. Commissioner,263 F.2d 460 (9th Cir. 1959). *573 The Ninth Circuit in Parkside stated that the fact "That sales take place in the course of a 'liquidation' neither automatically compels nor forecloses a finding that property was held primarily for sale in the ordinary course of a trade or business," and cautioned that their opinion does not "establish * * * a precise balance of factors as a rule of law for all cases of this type. In the final analysis, each case must be decided upon its own facts. This is especially so in tax maters." Parkside v. Commissioner, supra at 1096. Based on the facts and circumstances of the instant case, we find for petitioners and hold they are entitled to capital gains treatment. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. In Biedenharn, the Fifth Circuit considered the issue of whether a taxpayer's prior investment intent will endure and control despite substantial sales activity, and the court stated that: We reject the Government's sweeping contention that prior investment intent is always irrelevant. There will be instances where an initial investment purpose endures in controlling fashion notwithstanding continuing sales activity. We doubt that this aperture, where an active subdivider and improver receives capital gains, is very wide; yet we believe it exists. We would most generally find such an opening where the change from investment holding to sales activity results from unanticipated, externally induced factors which make impossible the continued pre-existing use of the realty. * * * Acts of God, condemnation of part of one's property, new and unfavorable zoning regulations, or other events forcing alteration of taxpayer's plans create situations making possible subdivision and improvement as a part of a capital gains disposition. [Biedenharn Realty Co. v. United States, supra at 421-422.] [Emphasis added.] Only limited number of cases have found the liquidation "niche" available to taxpayers as a means to retain capital gains treatment. See, e.g., Barrios Estate v. Commissioner,265 F.2d 517 (5th Cir. 1959); Erfurth v. Commissioner,T.C. Memo 1987-232↩. 3. The Internal Revenue Code treats interest on debts owed to the corporation, to the extent such debts represent the price for which real property held primarily for sale to customers in the ordinary course of [the taxpayer-corporation's] trade or business was sold or exchanged * * * [,] section 543(b)(3), as "rent" which, in turn, is generally excluded from personal holding company income where it constitutes 50 percent or more of taxpayer's adjusted ordinary gross income, section 543(a)(2)(A). [Parkside v. Commissioner, supra↩ at 1094.] 4. Petitioners point out that the total expense of the maintenance and cosmetic improvements made prior to sale was $ 100,163.93 which is not substantial (4.7%) compared to the gross sales price of $ 2,144,295 realized from the sale of 31 of the 36 units. ↩