ZANE R. TOLLIS AND ESTATE OF VIRJEAN TOLLIS, DECEASED, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Tollis v. Commissioner
Docket Nos. 20663-90, 28316-90, 28355-90
United States Tax Court
T.C. Memo 1993-63; 1993 Tax Ct. Memo LEXIS 64; 65 T.C.M. (CCH) 1951; February 24, 1993, Filed *64 Decisions will be entered under Rule 155. For petitioners: Sheldon M. Sager, Jeffrey M. Levinson, and Norman S. Buckvar. For respondent: Jillena A. Warner. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies in Federal income tax and additions to tax as follows: Zane R. Tollis and Estate of Virjean Tollis, Deceased
Docket No. 20663-90
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661(a)
1987
$ 30,814
$ 1,541
50% of the
$ 7,704
interest due
on $ 30,814
Zane R. Tollis and Estate of Virjean Tollis, Deceased
Docket No. 28316-90
Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6651(a)
1977
$ 390,597.48
$ 20,524.39
--   --     $ 97,649.37
1980
228,159.34
14,546.48
--   --      --   1981
290,233.68
--   $ 17,347.62
[1] 50% of the   *65 --   interest due  on $ 61,279.31  1982
187,223.98
--   10,381.27
[2] 50% of the   --   interest due  on $ 1,043  1983
1,270.39
--   --   --      --   1984
835.66
--   --   --      --   Zanco, Inc.
Docket No. 28355-90
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 7,342
$ 367
50% of the
interest due
on $ 7,342
Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All references to petitioner are to Zane R. Tollis. All references to the Tollises are to petitioner and Virjean Tollis or the Estate of Virjean Tollis. After concessions by the parties, the following issues remain for decision: (1) Whether the Tollises realized capital gain or ordinary income from their sales of various parcels of real property and condominium units during the taxable years 1977, 1980-84, and 1987; (2) whether the Tollises are liable for additions to tax *66 for negligence under section 6653(a) for the years 1977 and 1980-82; and (3) whether Zanco, Inc. (Zanco), is liable for an addition to tax for negligence under section 6653(a) for 1981. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein. When the petitions in docket Nos. 20663-90 and 28316-90 were filed, Virjean Tollis was deceased, petitioner was the executor of the Estate of Virjean Tollis, and he resided in Broadview Heights, Ohio. Zanco is an Ohio corporation that had a Broadview Heights, Ohio, mailing address when the petition in docket No. 28355-90 was filed. In 1945, petitioner was discharged from the U.S. Army, and he obtained a real estate sales license. Petitioner worked for a real estate broker in the Cleveland, Ohio, area for the next few years. In or about 1950, petitioner obtained his own real estate broker's and insurance licenses, and started his own real estate business. The Tollises subsequently acquired numerous parcels of real estate in the Cleveland area. Petitioner built, sold, and insured single-family houses on these parcels. The Tollis Parkway Property
*67 In 1958, the Tollises acquired approximately 69 acres of real estate in Broadview Heights, Ohio (the Tollis Parkway property), on which petitioner planned to build and sell single-family houses. A recession in the market for single-family houses caused petitioner to change his plan and request the city government to rezone the Tollis Parkway property for residential apartment use. Petitioner's request was granted, and in 1962, the Tollis Building Co., a corporation in which petitioner owned 87.5 percent of the stock during the years at issue, constructed the first apartment building on the Tollis Parkway property. Soon thereafter, petitioner constructed approximately 10 additional apartment buildings on the Tollis Parkway property. Sometime later in the 1960's, petitioner traveled to Italy. While in Italy, petitioner visited his grandfather, who lived in a condominium. Petitioner had had no previous experience with condominiums, and he found condominium life appealing. Petitioner thereupon decided to build and sell condominiums, and on his return to the United States, he built the first condominium projects in Ohio. Over the next several years, petitioner or Zanco, a real *68 estate development corporation owned entirely by petitioner, built approximately 400 condominium units on the Tollis Parkway property. While the number of condominium units built varied with each building, petitioner kept the number of units per building small because he believed that smaller buildings would be easier to manage and maintain. After the condominium buildings were constructed, Zanco and petitioner, through Tollis Realty, a real estate management company owned by petitioner and operated by his son, Terry, sold the condominium units to the public in the ordinary course of their business. The Tollises retained (or acquired from Zanco) ownership of several of the Tollis Parkway property condominium units, most of which they leased to tenants from time to time. The Tollises retained or acquired these units because petitioner believed that owning them would make it easier to manage and maintain the condominium buildings and adjoining property. Until 1979, when petitioner decided that he wanted to retire, the Tollises did not advertise that these condominium units were for sale. However, if offered an acceptable price for one of these units, the Tollises would sell it. *69 The Tollises' Real Property Sales
On November 2, 1977, the Tollises transferred 5.58 acres of the Tollis Parkway property (parcel Q) to Zanco for a promissory note in the principal amount of $ 648,000, payable on November 2, 1981, with interest of 8 percent per annum, payable semi-annually. At the time of transfer, the Tollises had an adjusted basis of $ 7,500 in parcel Q; the fair market value of parcel Q was $ 460,000; and the fair market value of the promissory note was $ 473,487.25. [2] The Tollises received payments and interest on the promissory note as follows: Year
Payments
Interest
1980
$ 569,664
$ 137,948.59
1981
21,503
19,053.88
1982
47,245
12,085.05
1983
49,216
24,097.39
1984
19,450
12,318.21
707,078
205,503.12
The Tollises did not elect installment sale treatment, on their 1977 Federal income tax return, for the sale of parcel Q to Zanco, nor did they report, on their 1977 and 1980-84 Federal income tax returns, any capital gain or ordinary income arising from the sale of parcel Q to Zanco. The Tollises also did not report, on their 1980-84 Federal income tax returns, any of the interest income that they received on the promissory note. *70 In 1979, petitioner, having decided to retire from the real estate business, discussed his retirement plans with his son, Terry, who indicated that he wished to continue managing the Tollises' rental and condominium properties. However, Terry showed no interest in continuing petitioner's real estate development business. Petitioner subsequently discussed his retirement plans with officers of Parkview Federal Savings and Loan Association (Parkview Federal), his principal institutional lender. In the course of these discussions, petitioner and Parkview Federal agreed on a plan that would allow Parkview Federal to take over all of petitioner's real estate development operations over *71 the next several years. [3]
On January 7, 1980, in aid of Parkview Federal's plan to take over petitioner's development business, the Tollises and PVF Service Corp. (PVFSC), a corporation related to Parkview Federal, entered into a successive option contract. Under the contract, PVFSC acquired the exclusive right to purchase certain vacant parcels of Tollis Parkway property (parcels R through Z) for $ 400,000 each, between July 15, 1980, and January 15, 1988. The contract also provided that, on or before December 31, 1981, the Tollises would pay for and complete construction of the Tollis Parkway roadway and install sewers and water lines along the roadway. In 1980, PVFSC exercised its option to purchase parcel Z under the successive option contract. In consideration therefor, the Tollises received $ 400,000 in cash, $ 300,000 in 1980 and $ 100,000 in 1981. At the *72 time of sale, the Tollises' adjusted basis in parcel Z was $ 45,395. The Tollises did not report, on their 1980-81 Federal income tax returns, any capital gain or ordinary income from their sale of parcel Z. On March 19, 1981, the Tollises sold parcel V to PVFSC under the successive option contract for $ 400,000. At the time of sale, the Tollises' adjusted basis in parcel V was $ 66,397. The Tollises incurred expenses of $ 1,745 in connection with their sale of parcel V, and they reported, on Schedule D to their 1981 income tax return, long-term capital gain of $ 331,858 from that sale. On January 22, 1982, the Tollises sold parcel U to PVFSC under the successive option contract. In consideration therefor, PVFSC paid the Tollises $ 280,000 in cash and canceled a $ 120,000 note of Zanco, on which the Tollises had previously assumed liability. At the time of sale, the Tollises' adjusted basis in parcel U was $ 50,722, and they incurred expenses of $ 1,712.50 in connection with their sale of parcel U. The Tollises did not include, on their 1982 income tax return, PVFSC's cancellation of the $ 120,000 note as a payment received for parcel U. Rather, the Tollises reported long-term *73 capital gain of $ 243,295.64, by reason of an installment sale based on a payment received of $ 280,000 and a total sales price of $ 400,000. In 1983, PVFSC notified petitioner that the economic recession would preclude it from exercising any of its remaining options under the successive option contract. On December 31, 1983, the Tollises and PVFSC entered into an agreement for termination of options, terminating the successive option contract and the September 16, 1982, addendum thereto, which had extended the exercise dates provided in the original contract. [4]
While the successive option contract and the addendum were in effect, petitioner did not participate in either the construction or management of any Tollis Parkway *74 property, except that he completed the Tollis Parkway roadway and installed the sewer and water lines. However, after the Tollises and PVFSC agreed to terminate the successive option contract and the addendum, petitioner developed residential housing on at least one of the three parcels not purchased by PVFSC because he did not have immediate success in finding new buyers for any of these parcels. [5]
On September 30, 1987, the Tollises sold parcel T to PCA, Inc. (PCA) for $ 240,000. At the time of sale, the Tollises' adjusted basis in parcel T was $ 38,018. The Tollises reported, on Schedule D to their 1987 income tax return, long-term capital gain of $ 201,982 arising from their sale of parcel T. The Tollises' Condominium Sales
In 1977, the Tollises sold two of the Tollis Parkway property condominium units in *75 which they had retained an ownership interest. The Tollises had acquired the first unit in 1975 and sold it for $ 31,900 on September 28, 1977. The Tollises sold the second unit, which the Tollises had acquired in 1969, for $ 32,000 on October 27, 1977. The Tollises had never leased either unit, and their adjusted basis, at the time of sale, in the two units was $ 23,152.40 ($ 24,202.40 less depreciation of $ 1,050) and $ 18,114.63 ($ 21,890.85 less depreciation of $ 3,776.22), respectively. The Tollises reported, on Schedule D to their 1977 income tax return, long-term capital gain of $ 8,747.60 and $ 13,885.37, respectively, arising from their sales of these units. Sometime after 1979, petitioner, as part of his retirement plan, decided that he would sell the remaining condominiums units in which the Tollises had retained ownership. In July 1981, the Tollises sold condominium unit number 307, which they had acquired in 1980, to Terrarius Investment Co. for $ 73,875.08, including $ 22,000 in forgiven debt. On Form 4562 to their 1981 income tax return, the Tollises reported a "cost or other basis" of $ 65,663.01, current year depreciation of $ 1,491.18, and prior depreciation *76 of $ 372.80 on unit number 307. The Tollises also reported, on their 1981 income tax return, an ordinary loss of $ 11,924 arising from their sale of unit number 307. In so doing, the Tollises did not include the $ 22,000 of forgiven debt in the sales price. The Tollises sold condominium units numbered 306, 155-C, and 138-A on June 27, 1983, July 12, 1983, and September 9, 1983, respectively. The Tollises had acquired unit number 306 on September 15, 1980, unit number 155-C on September 4, 1981, [6] and unit number 138-A in 1963. On Form 4562 to their 1983 income tax return, the Tollises claimed current year depreciation deductions of $ 1,491.17 and $ 364.22 on condominium units numbers 306 and 138-A, respectively. The Tollises also reported, on Form 4562 to their 1983 income tax return, depreciation allowed or allowable in earlier years of $ 6,337.50 and $ 14,787.12 on condominium units numbers 306 and 138-A, respectively. On Schedule D to their 1983 income tax return, the Tollises reported gross sales prices, adjusted basis, and long-term capital gain from the sales of these condominium units as follows: Property
Sales Price
Adjusted Basis
Capital Gain
Condominium #306
$ 71,000
$ 58,055.83
$ 12,944.17
Condominium #155-C
42,000
18,500.00
[1] 23,500.00
Condominium #138-A
43,000
14,359.05
28,640.95
*77 The Tollises sold condominium units numbers *78 106, 162-D, and 105 on January 13, 1984, March 1, 1984, and May 22, 1984, respectively. The Tollises had acquired unit number 106 in 1980, unit number 162-D on September 4, 1981, [7] and unit number 105 in 1980. On Form 4797 to their 1984 income tax return, the Tollises reported depreciation allowed or allowable of $ 10,594.90, $ 8,772.91, and $ 10,145.19 on condominium units numbers 106, 162-D, and 105, respectively. The Tollises also reported, on Form 4797 to their 1984 income tax return, gross sales prices, adjusted basis, and long-term capital gain from the sales of these condominium units as follows: Property
Sales Price
Adjusted Basis
Capital Gain
Condominium #106
$ 66,461,33
$ 52,261.60
$ 14,199.73
Condominium #162-D
30,529.24
19,300.44
[1] 11,228.80 *79 Condominium #105
70,624.44
50,201.82
20,422.62
Each of the condominium units sold by the Tollises in 1981, 1983, and 1984 had been leased to a tenant by the Tollises prior to its sale. Additional Transactions
On March 23, 1981, Zanco and PVFSC entered into a real estate purchase agreement whereby PVFSC agreed to purchase parcel Q and the condominium buildings that Zanco had constructed thereon. The agreement provided that, in consideration therefor, PVFSC would assume payment on a $ 5 million note, having an outstanding principal amount of $ 2,115,415.19, that Zanco had executed and delivered to Broadview Savings and Loan Association on April 7, 1978. Zanco reported, on its 1981 income tax return, that its cost basis in the property had been $ 648,000. However, at the time of sale, Zanco's cost basis in the property was $ 460,000. On September 27, 1982, the Tollises sold parcel *80 374-01-022, located on West 130th Street in Middleburg Heights, Ohio, for $ 136,000, of which the Tollises received $ 7,000 in 1982 and $ 59,950 in 1983. [8] Although the Tollises did not report their sale of parcel number 374-01-022 on their 1982 income tax return, they did report the sale on an installment basis on their 1983 income tax return, showing a selling price of $ 129,000, an adjusted basis of $ 87,635.35, and long-term capital gain of $ 15,585. In addition to the long-term capital gain of $ 15,585 that the Tollises reported on their 1983 income tax return, they had long-term capital gain of $ 2,086 in 1982 and $ 2,292 in 1983 on their 1982 sale of parcel number 374-01-022. *81 Zanco claimed deductions of $ 29,622 and $ 35,773, on its 1981 income tax return, for wages and professional fees, respectively. The parties have stipulated that, of these amounts, Zanco is not entitled to claimed deductions for wages and legal fees in the amounts of $ 2,000 and $ 5,000, respectively. For the years at issue, petitioners were calendar year taxpayers, who had their income tax returns prepared by their accountant. Petitioners regularly provided their accountant with all documents necessary to prepare their tax returns. OPINION Character of Sales Proceeds
The principal issue for decision is whether respondent erred in determining that the Tollises realized ordinary income from their sales of various parcels of Tollis Parkway property and condominium units during the taxable years 1977, 1980-84, and 1987. [9] Petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a); Guardian Industries Corp. v. Commissioner, 97 T.C. 308, 316 (1991). *82 Under section 1221, the general rule is that property held by a taxpayer, whether or not it is connected with his trade or business, is a capital asset. However, property held by a taxpayer is not a capital asset when it is held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. Sec. 1221(1). The purpose of section 1221(1) is to "differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand * * * and 'the realization of appreciation in value accrued over a substantial period of time' on the other." Malat v. Riddell, 383 U.S. 569, 572 (1966) (citations omitted). For section 1221(1) purposes, "primarily" means "of first importance" or "principally". Id.
A taxpayer may hold real property primarily for sale to customers in the ordinary course of his trade or business and, at the same time, hold other real property for investment purposes. Eline Realty Co. v. Commissioner, 35 T.C. 1, 5 (1960); Planned Communities, Inc. v. Commissioner, T.C. Memo. 1980-555. Although the primary purpose for which *83 a taxpayer holds property may change, it is the primary purpose for which the property is held at the time of sale that determines its tax treatment. Cottle v. Commissioner, 89 T.C. 467, 487 (1987). Whether property is held primarily for sale to customers in the ordinary course of the taxpayer's trade or business is a question of fact that is to be determined on a case-by-case approach, Gartrell v. United States, 619 F.2d 1150, 1153 (6th Cir. 1980), and we may consider earlier events to help us decide what the primary purpose was at the time of sale, Cottle v. Commissioner, supra at 487. Over the years, courts have considered a variety of factors in determining the taxpayer's primary purpose for holding property: (1) The taxpayer's purpose in acquiring the property and the duration of his ownership, (2) the taxpayer's everyday business and the relationship of realty income to total income, (3) the frequency, continuity, and substantiality of the sales, (4) the extent to which the taxpayer improved the property, (5) the extent to which the taxpayer used advertising, promotion, or other *84 activities to increase sales, (6) the use of a business office for the sale of the property, (7) the character and degree of supervision or control the taxpayer exercised over any representative selling the property, and (8) the time and effort the taxpayer habitually devoted to the sales. Id. at 487; Maddux Construction Co. v. Commissioner, 54 T.C. 1278, 1284 (1970); see also Gartrell v. United States, supra at 1154-1155. Although these factors may aid the finder of fact in determining, on the entire record, the taxpayer's primary purpose for holding property, they have no independent significance and individual comment on each factor is not necessary or required. Cottle v. Commissioner, supra at 487-489; see also Suburban Realty Co. v. United States, 615 F.2d 171, 177-179 (5th Cir. 1980); Hay v. Commissioner, T.C. Memo. 1992-409. A. Sales of Vacant Tollis Parkway Property
On brief, petitioners concede that the principal purpose for which the Tollises acquired the Tollis Parkway *85 property, including the parcels at issue, was to enable petitioner to develop residential housing for sale to customers in the ordinary course of his real estate development and sales business. However, petitioners contend, citing Hale v. Commissioner, T.C. Memo. 1965-274, that the Tollises did not realize ordinary income from the sales at issue because petitioner did not sell vacant land to customers in the ordinary course of his real estate development and sales business. In the alternative, petitioners contend that the Tollises did not realize ordinary income from the sales of parcels Z, V, U, and T because, after petitioner decided to retire from the real estate business, these parcels ceased to be held for sale to customers in the ordinary course of that business. Respondent contends that the Tollises realized ordinary income from their sales of parcels Q, Z, V, U, and T. Respondent argues that the purpose for which the Tollises acquired these parcels was to develop them for sale to customers in the ordinary course of petitioner's real estate development and sales business and that the mere fact that these parcels were vacant at the time of *86 sale did not change that purpose. Respondent further argues that petitioner's decision to retire from the real estate business did not change the purpose for which the Tollises held parcels Z, V, U, and T. For the reasons that follow, we agree with respondent. In Hale v. Commissioner, supra, we held that the taxpayers, partners in a real estate development partnership, realized long-term capital gain from the partnership's sales of five vacant parcels of real estate. Although the five parcels of real estate had been acquired to enable the partnership to develop single-family houses to be sold in the ordinary course of its business, we found that zoning obstacles, drainage problems, and financial difficulties had caused the partnership to discontinue its plans to develop houses on these parcels. Id. We therefore concluded that the five parcels of real estate had become isolated from the partnership's real estate development business and were held for investment purposes at the times of sale. Id.
The Tollises' case is distinguishable from Hale v. Commissioner, supra. The mere fact that the parcels at *87 issue were vacant at the times of their sales does not indicate that the Tollises' purpose for holding the parcels had changed to investment. Cf. Engasser v. Commissioner, 28 T.C. 1173, 1178 (1957); see also Major Realty Corp. v. Commissioner, T.C. Memo. 1981-361, affd. on this issue 749 F.2d 1483 (11th Cir. 1985). It is the purpose for which the Tollises held the parcels at the times of sale and not whether the parcels were vacant at those times that determines whether the Tollises realized ordinary income or capital gain from the sales. Major Realty Corp. v. Commissioner, supra; see also Kesicki v. Commissioner, 34 T.C. 675, 679 (1960); Engasser v. Commissioner, supra at 1178. When the Tollises sold parcel Q to Zanco in 1977, petitioner was building condominium units on the Tollis Parkway property for sale to customers in the ordinary course of his real estate development and sales business. Petitioner was building these condominium units with the aid of Zanco, a real estate development *88 corporation he controlled. The sale of parcel Q to Zanco, which subsequently built condominium units on parcel Q, was clearly in aid of these efforts. Thus, the Tollises' sale of parcel Q to Zanco was merely a continuation of petitioner's real estate development and sales business and the profits arising therefrom are ordinary income under section 1221(1). Engasser v. Commissioner, supra at 1178; Tibbals v. United States, 176 Ct. Cl. 196, 362 F.2d 266, 271-272 (1966). Nor were the Tollises holding parcels Z, V, U, and T for investment, rather than for sale to customers, when they sold these vacant parcels to PVFSC and PCA. If these sales had not occurred, petitioner, unlike the taxpayers in Hale, planned to develop residential housing on the parcels while he pursued new buyers for them. [10] Thus, had the Tollises continued to hold these parcels, petitioner would have carried out his original plan to develop residential housing on them for sale in the ordinary course of his business. Under the circumstances, the fact that the parcels were vacant at the times of sale does not indicate that the *89 Tollises' purpose for holding the parcels had changed to investment. Cf. Kesicki v. Commissioner, supra at 679; Major Realty Corp. v. Commissioner, supra.
Notwithstanding the above, petitioners argue that parcels Z, V, U, and T were sold in aid of petitioner's retirement plan and that the purpose for which the Tollises held these parcels changed to investment when petitioner decided to retire in 1979. We disagree. Although we have never had occasion to consider whether a real estate developer's decision to retire changes the purpose for which he holds real property, comparable precedent calls for a negative answer. In Grace Bros., Inc. v. Commissioner, 10 T.C. 158 (1948), affd. 173 F.2d 170 (9th Cir. 1949), *90 the taxpayer argued that it realized capital gain from its sale of the stock of wine it had accumulated while operating a winery. Prior to the sale, the taxpayer had decided to leave the wine business to concentrate on other business activities. Id. at 159-160. In the face of the taxpayer's argument that its stock of wine had become a capital asset by virtue of its decision to leave the wine business, we held that assets being held for sale to customers in the ordinary course of business do not become capital assets because of an intent to liquidate, followed by the disposition of an entire business or a portion thereof. Id. at 163. We therefore concluded that the taxpayer realized ordinary income from the sale of its stock of wine. Id.
Six years after we decided Grace Bros., Inc., in Estate of Ferber v. Commissioner, 22 T.C. 261 (1954), we had occasion to confirm our view on this "liquidation" rule. Although the issue for decision in Estate of Ferber was whether a deceased furrier's estate realized capital gain or ordinary income when it sold the decedent's remaining inventory *91 of pelts and fur coats, we prefaced our discussion by stating that "the furs were not capital assets in the hands of the decedent and there are cases holding that he could not have changed their character by deciding to terminate or liquidate his business". Estate of Ferber v. Commissioner, supra at 263 (citations omitted). While the assets in question in Grace Bros., Inc. and Estate of Ferber were inventory or stock in trade, we think the "liquidation" rule that we articulated in those cases also applies to section 1221(1) real property. See Martin v. United States, 330 F. Supp. 681 (M.D. Ga. 1971); see also Lawrie v. Commissioner, 36 T.C. 1117 (1961). We therefore hold that petitioner's decision to retire from the real estate business did not change parcels Z, U, V, and T into capital assets. Accordingly, we sustain respondent's determination and hold that the Tollises realized ordinary income from their sales of parcels Q, Z, V, U, and T. B. Condominium Sales
Petitioners contend that respondent erred in determining that the Tollises realized ordinary income from *92 their sales of various Tollis Parkway condominium units. Petitioners argue that petitioner's real estate management activities were in addition to, and not part of, petitioner's real estate development and sales business, and that the Tollises held the condominium units at issue for use in the real estate management business. Respondent, on the other hand, argues that petitioner sold individual condominium units in the ordinary course of his real estate business and that, at the times of sales, the condominium units at issue were being held for sale in the ordinary course of that business. For the reasons that follow, we agree with petitioners and hold that the Tollises realized capital gain on the sale of each of the condominium units at issue, except unit number 307. Over the years, petitioner's business activities with respect to the Tollis Parkway property included both development and sale of condominium units and management of the buildings housing these units. Although each of these activities is clearly part of a general real estate business, petitioner kept his real estate management activities separate from his real estate development and sales activities by forming *93 different companies to aid him in the operation of the respective businesses. Petitioner also hired his son, Terry, to oversee the daily operation of his real estate management business, permitting him to concentrate his personal efforts on the real estate development and sales activities and further separating his management efforts from his development and sales efforts. We therefore hold that petitioner's real estate management activities were in addition to, and not part of, his real estate development and sales business. Having decided that petitioner's real estate management activities were a separate business, we must determine whether the Tollises held the condominium units at issue for use in the management business or for sale in the development and sales business. Petitioner testified that the Tollises retained or acquired the condominium units at issue because he believed that owning the units would make it easier to manage the condominium buildings and adjoining property. Petitioner and his longtime secretary, Mrs. Lopiccolo, also testified that the Tollises did not advertise that the condominium units at issue were for sale prior to his 1979 decision to retire from *94 the real estate business. Consistent with this testimony, either the Tollises or Zanco owned six out of nine of the condominium units at issue for approximately 4 years, four of them for at least 8 years, prior to their sale. Even if there was a recession in the housing market at the time, as respondent argues, it is unlikely that petitioner would have waited 8 years to sell condominium units he was holding for sale in the ordinary course of his real estate development and sales business. Although we recognize the hazards of relying on petitioner's self-serving testimony, Philhall Corp. v. United States, 546 F.2d 210, 215 (6th Cir. 1976), we have found his testimony on this issue credible and supported by the objective evidence. Accordingly, the Tollises' primary purpose for holding the condominium units at issue, at the times of sale, was for use in petitioner's real estate management business. Section 1221(2) provides that real property, including any buildings constructed thereon, is not a capital asset if it is used in the taxpayer's trade or business. However, for the years at issue, section 1231 provides that the taxpayer is entitled to capital *95 gain treatment, to the extent that net gains exceed losses, on the sale of real property used in the taxpayer's trade or business if the property has been held for more than 1 year [11] and the property is not: (1) The kind of property that would be includable in inventory, (2) property held for sale to customers in the ordinary course of the taxpayer's trade or business, or (3) a copyright, composition, letter, memorandum, or similar property held by a taxpayer described in paragraph 3 of section 1221. The condominium units at issue are neither the kind of property that would be includable in inventory nor a copyright, composition, letter, memorandum, or similar property. Moreover, prior to 1979, the Tollises' few sales of condominium units used in petitioner's *96 real estate management business occurred without the benefit of advertising and only if the Tollises were offered an acceptable price. While sales activity, including advertising, with respect to these condominium units increased after 1979, this increase in sales activity was related to petitioner's decision to retire from the real estate management business. Under the circumstances, the increase in the level of sales activity was prompted by efforts to liquidate petitioner's real estate management business, rather than by a change in holding purposes. Cf. Gangi v. Commissioner, T.C. Memo. 1987-561 (sales of rental properties, and an increase in the level of advertising related thereto, held by a liquidating partnership did not change the primary purpose for holding the properties). We therefore conclude that the Tollises did not hold the condominium units at issue for sale to customers in the ordinary course of petitioner's real estate management business, and that the Tollises are entitled to capital gain treatment on their net gains realized from the sales of those units that they held for at least 1 year. Secs. 1221(2), 1231. We have determined *97 that the Tollises acquired and sold the condominium units at issue as follows: Condominium Units
Date Acquired
Date Sold
Unit "1975"
1975
Sept. 28, 1977
Unit "1969"
1969
Oct. 27, 1977
Unit # 307
1980
July, 1981
Unit # 155-C
Sept. 4, 1981
July 12, 1983
Unit # 138-A
1963
Sept. 9, 1983
Unit # 306
Sept. 15, 1980
June 27, 1983
Unit # 105
1980
May 22, 1984
Unit # 106
1980
Jan. 13, 1984
Unit # 162-D
Sept. 4, 1981
Mar. 1, 1984
On this record, the Tollises clearly held each of the condominium units at issue, except for unit number 307, for at least 1 year. Because the Tollises acquired condominium unit number 307 sometime in 1980 and sold it in July 1981, it is unclear whether they held that unit for at least 1 year prior to sale. Thus, the Tollises have not established that they held condominium unit number 307 for more than 1 year, and as a consequence, they have failed to prove that they satisfied the requirements of section 1231(b)(1) with respect to that unit. We accordingly hold that the Tollises are entitled to capital gain treatment on the net gains they received from their sales of the condominium units at issue, except for condominium unit number *98 307 whose sale in 1981 resulted in ordinary income. Negligence Additions to Tax
Section 6653(a) provides that if any part of any underpayment in tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. [12] *99 For taxes for which the last date prescribed for payment is after December 31, 1981, section 6653(a)(2) provides that an amount equal to 50 percent of the interest payable under section 6601 on any portion of the underpayment which is attributable to negligence or intentional disregard of rules and regulations shall be added to the tax. [13] Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do in a similar situation. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In determining whether the taxpayer was negligent or intentionally disregarded rules and regulations, we consider his experience and knowledge. DeRochemont v. Commissioner, T.C. Memo. 1991-600. A. The Tollises
Petitioners contend that the Tollises are not liable for additions to tax for negligence under section 6653(a) for 1977 and 1980-82. [14] Petitioners argue that the Tollises' failure to report income for the years at issue resulted from their good faith reliance on tax advice they received from their accountant. Petitioners argue that it was reasonable for the Tollises to rely on their accountant's income computations because they had provided him with all of the information necessary to prepare their income tax returns. Respondent contends that the Tollises are liable for the additions to tax for negligence under section 6653(a) *100 for 1977 and 1980-82. Respondent argues that the Tollises were negligent because they failed to report income from the sales of parcel Q, parcel Z, parcel U, and parcel number 374-01-022 and because they failed to review their income tax returns for correctness before they signed and filed them. Respondent also argues that the Tollises' reliance on their accountant's income computations was not reasonable because no special training or effort was needed to determine that they had failed to report the sales proceeds on their income tax returns. Respondent's determinations are presumptively correct, and petitioners have the burden of proving them erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). A taxpayer acts reasonably when he provides his accountant or attorney with all relevant information necessary to prepare his tax return, and he relies, in good faith, on the advice of his attorney or accountant regarding a matter of substantive tax law. Jaques v. Commissioner, T.C. Memo. 1989-673, affd. 935 F.2d 104 (6th. Cir. 1991); see also United States v. Boyle, 469 U.S. 241, 251 (1985). *101 The taxpayer, however, bears the ultimate responsibility for the correctness of his income tax return, and good faith reliance on professional advice is not a substitute for compliance with an unambiguous statute that requires no special training or effort to understand and apply. United States v. Boyle, supra at 251-252. Accordingly, where the taxpayer delegates the preparation of his income tax return to a tax return preparer, the taxpayer has a duty to provide the tax return preparer with all relevant information necessary to prepare the return, Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Jaques v. Commissioner, supra, and to review his completed tax return before signing it, Biederstadt v. Commissioner, T.C. Memo. 1989-235; see also Pervier v. Commissioner, T.C. Memo. 1989-344. Petitioners are incorrect in arguing that the Tollises were not negligent for failing to report proceeds from the sales of certain property on their income tax returns because they relied on their accountant's income computations. No *102 special training or effort is necessary to know that an individual is required to report income or gain from the sale of property on his income tax return. Congress has unambiguously stated that "gross income means all income from whatever source derived, including (but not limited to) * * * Gross income derived from business * * * [and] Gains derived from dealings in property". Sec. 61(a). Petitioner, a businessman with over 30 years' experience in real estate matters, obviously knew that proceeds from sales of property were either gross income derived from business or gains derived from dealings in property. Thus, at a minimum, the Tollises' unambiguous obligation under the statute was to report the sales proceeds on their income tax returns as either ordinary income or capital gain. Cf. United States v. Boyle, supra.
The Tollises failed to report income they received from the sales of parcel Q, parcel Z, parcel U, and parcel number 374-01-022 during the years at issue. Petitioner admitted that he did not review his income tax returns for the years at issue. Had petitioner reviewed the income tax returns, he would have noticed that his *103 accountant failed to include the substantial proceeds from these sales in gross income. Inasmuch as the Tollises failed to report income and did not verify the accuracy of their income tax returns before signing and submitting them, we find that they failed to do what a reasonable and ordinarily prudent business person would have done under similar circumstances. See, e.g., Morrow v. Commissioner, T.C. Memo. 1991-101; Biederstadt v. Commissioner, supra.We therefore sustain respondent's determination and hold the Tollises liable for additions to tax for negligence under sections 6653(a) and 6653(a)(1) for 1977 and 1980-82. Because the underpayments on which respondent determined that the Tollises were liable for additions to tax under section 6653(a)(2) for 1981 and 1982 were attributable to their failure to report income from their sales of parcel Z and parcel 374-01-022, see tables supra p. 2 notes 1-2, we also hold the Tollises liable for those additions to tax. B. Zanco
Petitioners contend that Zanco is not liable for an addition to tax for negligence under section 6653(a) for 1981. Petitioners *104 argue that Zanco underpaid its income tax for 1981 because it relied, in good faith, on its accountant's tax advice. Petitioners argue that Zanco acted reasonably in relying on its accountant's tax advice because Zanco had provided him with all of the information necessary to prepare its income tax return. Conversely, respondent argues that Zanco was negligent because it overstated its cost basis in parcel Q by $ 188,000 and because it took deductions for wages and legal expenses that were not ordinary and necessary business expenses under section 162. Respondent also argues that Zanco's reliance on its accountant's tax advice was not reasonable because no special training or effort was needed to determine Zanco's basis in parcel Q. Petitioners have the burden of proving respondent's determination erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). While petitioners have conceded that Zanco overstated its cost basis in parcel Q on its 1981 income tax return, petitioners have shown that Zanco was not negligent with respect to this overstatement. Zanco relied on an experienced tax accountant to prepare its 1981 income tax return, and *105 this accountant was provided with all information necessary to prepare the return. Although petitioners have conceded that Zanco's proper cost basis in parcel Q was the fair market value of the promissory note less a constructive dividend of $ 13,487.25 that the Tollises received as a result of that transaction, Zanco's accountant showed the parcel's cost basis as the face amount of the promissory note on its 1981 income tax return. To uncover this mistake by Zanco's accountant would have required some familiarity with substantive tax law. Because petitioner's lack of expertise in tax matters undoubtedly led him to cause Zanco to have its income tax return prepared by a professional, prudence and reasonable care did not require petitioner to challenge or disregard the advice of Zanco's expert adviser. Cf. United States v. Boyle, 469 U.S. 241, 251 (1985). We therefore find that Zanco acted reasonably in relying on its accountant's conclusion that its proper cost basis in parcel Q was the face amount of the promissory note it gave to the Tollises in 1977. Petitioners, however, have failed to prove that Zanco was not negligent in claiming deductions *106 for wages and legal expenses that it was not entitled to claim. Petitioners offered no evidence to show whether Zanco claimed these deductions because it failed to carefully examine its income tax returns or because it relied on the erroneous tax advice of its accountant. In fact, the record does not even show whether Zanco actually incurred these expenses. Inasmuch as the record is silent as to Zanco's claimed deductions for wages and legal fees, except for petitioners' concession that Zanco was not entitled to claimed deductions of $ 2,000 and $ 5,000, respectively, we cannot say that it was reasonable for Zanco to claim these deductions on its 1981 income tax return. We accordingly sustain respondent's determination that Zanco is liable for an addition to tax under section 6653(a)(1) for 1981. We also hold that Zanco is liable for an addition to tax under section 6653(a)(2) for 1981 to the extent that the underpayment on which that addition is determined is attributable to deductions for wages and legal fees that Zanco has conceded it was not entitled to claim. To reflect the foregoing, and because of concessions by the parties, Decisions will be entered under Rule 155 *107 . Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Zane R. Tollis and Estate of Virjean Tollis, Deceased, Zane R. Tollis, Executor, docket No. 28316-90; and Zanco, Inc., docket No. 28355-90.↩
1. In the statutory notice of deficiency, respondent determined that the portion of the underpayment of tax due to negligence was the amount of underpayment attributable to the Tollises' failure to report income from their sale of parcel Z.↩
2. In the statutory notice of deficiency, respondent determined that the portion of the underpayment of tax due to negligence was the amount of underpayment attributable to the Tollises' failure to report income from their sale of parcel 374-01-022.↩
2. The parties have stipulated that the Tollises received a constructive dividend of $ 13,487.25 when they transferred parcel Q to Zanco in 1977. The amount of the constructive dividend is the difference between the fair market value of parcel Q at the time of sale and the fair market value of the promissory note at the time of sale.↩
3. Although petitioner would have preferred to sell the development business all at once, Parkview Federal was unable or unwilling to accommodate him.↩
4. In this agreement for termination of options, Zanco and PVFSC also agreed to terminate an option to purchase real estate that they had entered into on Jan. 7, 1980. Under that option, PVFSC had acquired the exclusive right to purchase certain property located on Broadview Road for $ 400,000.↩
5. Petitioner participated in the post-1984 development of two 24-suite apartment buildings on parcel S, and Zanco constructed a series of cluster homes on the Tollis Parkway property after 1984.↩
6. The Tollises reported, on Schedule D to their 1983 income tax return, that they acquired condominium unit number 155-C on Sept. 4, 1973. However, the parties have stipulated that Zanco transferred, for no consideration, unit number 155-C to the Tollises on Sept. 4, 1981. The parties also have stipulated that the Tollises had additional income of $ 33,000 in 1981, by reason of a constructive dividend equal to the fair market value of unit number 155-C.↩
1. The parties have stipulated that the Tollises had a net gain of $ 10,486 from the sale of condominium unit number 155-C. The difference between the stipulated net gain and the net gain reported by the Tollises on their 1983 income tax return presumably relates to a change in the Tollises' adjusted basis in the unit, based on a cost basis of $ 33,000, the fair market value of the unit on the day it was transferred to the Tollises by Zanco, less depreciation allowed or allowable plus "expense of sale" incurred.↩
7. Although the parties have stipulated that Zanco transferred, for no consideration, condominium unit number 162-D to the Tollises on Sept. 4, 1981, the Tollises reported, on Form 4797 to their 1984 income tax return, that they acquired the unit in 1972.↩
1. Although the Tollises reported a net gain on the sale of condominium unit number 162-D, the parties have stipulated that the Tollises had a net loss of $ 4,905 from the sale of unit number 162-D. The reason for the discrepancy between the net gain reported on the Tollises 1984 income tax return and the stipulated net loss presumably relates to a change in the Tollises' adjusted basis in the unit, based on a cost basis of $ 38,000, the fair market value of the unit on the day it was transferred to the Tollises by Zanco, less depreciation allowed or allowable plus "expense of sale" incurred.↩
8. Although the parties have stipulated that the Tollises received $ 59,950 in 1983, the Tollises reported, on their 1983 income tax return, that they received $ 59,990 in 1983. The parties have neither explained this discrepancy nor that between the amount for which the Tollises sold the property, $ 136,000, and the amount that they received in payment for the property, $ 66,950 ($ 7,000 plus $ 59,950).↩
9. The sales at issue and the net gains realized by the Tollises as a result of those sales are: ↩
Property
Year of Sale
Net Gains from Sale
Parcel Q
1977
$ 452,500.00 1975 condo
1977
8,748.00 1969 condo
1977
13,885.00 Parcel Z
1980
265,950.00 Parcel Z
1981
88,650.00 Condo # 307
1981
10,076.00 Parcel V
1981
331,858.00 Parcel U
1982
347,565.00 Condo # 155-C
1983
10,486.00 Condo # 138-A
1983
28,640.95 Condo # 306
1983
12,944.17 Condo # 105
1984
20,422.62 Condo # 106
1984
14,199.73 Condo # 162-D
1984
(4,905.00)
Parcel T
1987
201,982.00 10. Consistent with this plan, petitioner subsequently developed residential housing on at least one parcel of Tollis Parkway property for which PVFSC did not exercise its option to purchase under the successive option contract.↩
11. Nine months for sales in 1977. Tax Reform Act of 1976, Pub. L. 94-455, sec. 1402(b)(2), 90 Stat. 1732-1733 (Congress changed the relevant holding period from "more than 9 months" to "more than 1 year", effective for taxable years beginning after Dec. 31, 1977).↩
12. In sec. 722(b)(1) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 342, Congress redesignated sec. 6653(a) as sec. 6653(a)(1) for taxes for which the last date prescribed for payment is after Dec. 31, 1981.↩
13. Sec. 6653(a)(2) was added to the Internal Revenue Code by sec. 722(b)(1) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 342-343.↩
14. Respondent has conceded that the Tollises are not liable for an addition to tax for negligence under sec. 6653(a) for 1987.↩